JOHN F. SEAMAN, and ANN SEAMAN, Appellants, *v.* SOLOMON A. SMITH, Appellee.

APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

The line at which the water usually stands when free from disturbing causes, is the boundary of land in a conveyance calling for Lake Michigan as a line.

DECLARATION in ejectment, appellee against appellants, for the following land, situate in Cook county, and State of Illinois, to wit: That part of the north-east fractional quarter of Sec. 22, T. 39 N., R. 14 E. of third principal meridian, bounded as follows: Beginning on west line of said fractional quarter section, $277\frac{20}{100}$ feet south from north-west corner thereof; thence east, to centre of Wabash Avenue; thence north, 34 feet; thence west, to west line of said fractional quarter section; thence south, 34 feet, to place of beginning. Also that part of said quarter section described as follows: beginning at a point equidistant from east line of Wabash Avenue and the west line of Michigan Avenue, and $277\frac{20}{100}$ feet south of north line of said fractional quarter section; thence east, to the centre of Michigan Avenue; thence north, 34 feet; thence west, to a point 34 feet west from place of beginning; thence south, to said place of beginning; which said premises are claimed in fee.

The plaintiff gave in evidence —

1.   The patent of the United States to James Harrington, in fee for the north-west fractional quarter of Sec. 22, T. 39 N., R. 14 E. of third principal meridian, containing $106\frac{16}{100}$ acres.

2.   Deed in fee from James Harrington and wife to John S. Wright, dated December 3, 1834, for part of said fractional section, being $43\frac{87}{100}$ acres off the north part, commencing at north-west corner of said fractional section, at a cedar post, east, 18 chains and 50 links, to a cedar post; thence east, to Lake Michigan, from said north-west corner, 17 chains and 82 links, to a cedar post; thence east, 18 chains and 50 links, to a cedar post; thence east, to the lake; thence north, following the course of the lake, intersecting the north line aforesaid, containing $43\frac{87}{100}$ acres, by survey, be the same more or less.

3.   Deed from John S. Wright, to State Bank of Illinois, dated July 28th, 1840, in fee for last above described portion of land.

4.   Deed from State Bank to Matthew Laflin, in fee, dated December 20, 1845, for the following described portion of said fractional quarter, commencing at the north-west corner of said section 22, at a stone; running thence east, 21 chains and 50 links, to Lake Michigan; thence south, 12° 45', along the shore of said lake, 4 chains and 30 links; thence west, 22 chains and 45 links; thence north, 4 chains and 20 links, to the place of beginning; supposed to contain $9\frac{32}{100}$ acres.

5.   Deed from Matthew Laflin and wife, to plaintiff, Solomon A. Smith, in fee, dated June 12, 1850, the following described portion of said quarter section, to wit: beginning at the north-west corner of said quarter section, thence south, on the centre of State street, $277\frac{20}{100}$ feet; thence east, $451\frac{28}{100}$ feet, more or less, to the centre of Wabash Avenue; thence west, $56\frac{92}{100}$ feet; thence west, $234\frac{14}{100}$ feet, more or less, to a point equal distance from the west side of Wabash Avenue and the east side of State street; thence north, $220\frac{28}{100}$ feet, to the west line of said quarter section; thence west, $217\frac{14}{100}$ feet, to the place of beginning.

Also that part of said quarter section, bounded as follows: beginning on north line thereof, equi-distant from east side of Wabash Avenue, $682\frac{45}{100}$ feet from north-west corner thereof; thence east, on said north line, $226\frac{17}{100}$ feet, to centre of Michigan Avenue; thence south, $277\frac{20}{100}$ feet; thence west, $226\frac{17}{100}$ feet, to a point equi-distant from east side of Wabash Avenue and the west side of Michigan Avenue; thence north, $277\frac{20}{100}$ feet to the place of beginning.

The defendants gave in evidence —

1.   A deed from State Bank of Illinois to Augustus Garrett in fee, dated July 28, 1843, for the following portion of the said fractional quarter section, to wit, that part described as fol-

lows: beginning at south-west corner of that part thereof sold by James Harrington to John S. Wright, by deed dated December 3, 1834, and running north, along the west line of said fractional section, south and east to Lake Michigan, so as to include 33 acres of land, said land intended to be taken from the south end of north part of said fractional section.

2. A deed from said Augustus Garrett and wife, to said plaintiff, J. F. Seaman, of the undivided half of the premises conveyed by the last above mentioned deed, excepting therefrom the lot conveyed to James R. Maloney. The quantity intended to be conveyed being about 16½ acres.

It will be seen that under these deeds the true boundaries of the land sold Garrett, his being the first deed from the State Bank, depend upon the location of the line of the lake, as his tract, containing 33 acres, will be narrowed if the water line is pushed eastward towards the lake, and broadened if it is held to be farther to the westward.

The cause was tried by the court without the intervention of a jury, and judgment entered for the plaintiff.

GOODRICH, GOOKINS, THOMAS & ROBERTS, for Appellants.

C. BECKWITH, for Appellee.

WALKER, J. This record presents the question as to what answers the call for Lake Michigan, as a boundary line, in the various deeds in a chain of title, held by the plaintiff below. If high water mark is the point at which his land terminates, then this judgment should be reversed; but if, on the contrary, the line where the water usually stands when unaffected by storms and other disturbing causes, is the boundary, then the judgment must be affirmed. The question of which was the true line, was alone discussed upon the argument. The great lakes of the north, present questions affecting riparian rights, that are different from those arising under boundaries on the sea, upon rivers, or other running streams. They have neither appreciable tides nor currents, nor are they affected, like running streams, by rises and falls produced by a wet or dry season. Yet the rules that govern boundaries on the ocean, govern this case.

A grant giving the ocean or a bay as the boundary, by the common law, carries it down to ordinary high water mark. *Cortelyou* v. *Brundt*, 2 J. R. 357. The doctrine, it is believed, is well settled, that the point at which the tide usually flows is the boundary of a grant to its shore. As the tide ebbs and flows at short and regular recurring periods, to the same points,

a portion of the shore is regularly and alternately sea and dry land. This being unfit for cultivation or other private use, is held not to be the subject of private ownership, but belongs to the public. When the adjacent owner's land is bounded by the sea or one of its bays, the line to which the water may be driven by storms, or unusually high tides, is not adopted as the boundary. On the contrary, the ordinary high water mark indicated by the usual rise of the tide, is his boundary.

The principle, however, which requires that the usual high water mark is the boundary on the sea, and not the highest or lowest point to which it rises or recedes, applies in this case, although this body of water has no appreciable tides. Here, as there, the highest point to which storms or other extraordinary disturbing causes may drive the water on the shore, should not be regarded as the point where the owner's rights terminate, nor yet should it be extended to the lowest point to which it may recede from like disturbing causes. But it should be at that line where the water usually stands when unaffected by any disturbing cause. The portion of the soil which is only seldom covered with water, may be valuable for cultivation or other private purposes. And the line at which it usually stands, un-affected by storms and other causes, represents the ordinary high water mark on the ocean, and the point between the highest and lowest water marks produced by the tides.

Again, where is the lake, as called for by the deed? A fair and reasonable construction of the language, running to the lake and with the lake, would mean to that place where its outer edge is usually found. The mind would not understand that the highest point on the shore to which it had ever attained, or the lowest to which it had receded, was understood by the parties. Nor do we perceive any public necessity for adopting any other rule of construction, than the language naturally and reasonably imports.

These great bodies of water, having no currents, like rivers and other running streams, cannot present the same reasons why the boundary should be extended beyond the water's edge, where it is ordinarily found, that apply to running bodies of water. Where such streams are called for as a boundary, the thread of the current is held to be the line, from each side. Such a rule could not, for the want of a current, be adopted in this case. It would not be sanctioned either by analogy to the rule, or by reason. And if the outer edge of the water be passed, owing to the approximation of these bodies to a circular shape, it would be found exceedingly difficult, if not impossible, to ascertain where the boundary should be fixed, or the shape it should assume.

We are therefore clearly of the opinion, that the line at which the water usually stands, when free from disturbing causes, is the boundary of land in a conveyance calling for the lake as a line. This was the rule upon which the court below acted, and the judgment must be affirmed.

*Judgment affirmed.*