THE TRUSTEES OF SCHOOLS

*v.*

DAVID SCHROLL *et al.*

*Filed at Springfield May 12, 1887.*

1. SCHOOL LAND—*grant to State—completeness of title thereby given.* The enabling act of Congress of April 18, 1818, granting to the State section 16 of the public lands, and the ordinance of the State Constitutional Convention of August 26, 1818, accepting the same, constituted a solemn compact between the United States and this State, whereby the State became the purchaser of the school sections, with full power to sell or lease the same for the use of schools, as the State might provide, and think most beneficial to the inhabitants of the respective townships.

2. Sections 16 in the several townships within the State, after such grant and acceptance, were not public lands, within the act of Congress of March 30, 1822, relating to the Illinois and Michigan Canal, and were not within the act of Congress relating to swamp and overflowed lands.

3. BOUNDARY—*land bordering on a stream or river—and herein, of the distinction when the land lies along a natural lake or pond.* Streams and bodies of water within the ebb and flow of the tide, are, at common law, navigable, and the riparian proprietor's title does not, generally speaking, extend beyond the shore; but grants of land bounded on streams or rivers above tide water, carry the exclusive right and title of the grantee to the

centre of the stream, subject to the easement of navigation in streams navigable in fact, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the stream. But a different rule applies where land is conveyed bounded along or upon a natural lake or pond. In such case, the grant extends only to the water's edge.

4. The distinction between a stream and a pond or lake is, that in the one case the water has a natural motion or current, while in the other the water is, in its natural state, substantially at rest. This is so, independent of the size of the one or the other. The fact of some current in a body of water is not, of itself, in every instance, sufficient to make it a stream; nor will the swelling out of a stream into broad water sheets make it a lake.

5. A body of water five or six miles long, and in some places a mile in width, that is fed by springs, and has no connection with a river or other stream except by a slough, which is dry during the summer, and the body of water in its natural state has no current, is a lake, and not a stream of water.

6. A riparian proprietor claiming to the thread or middle of the stream must show the bordering water to be a stream, and that his grant, in terms or legal effect, is bounded upon or along such stream,—in other words, that the stream is made the boundary.

7. ADVERSE POSSESSION—*of land covered with water—sufficiency of proof.* The evidence to show twenty years' adverse possession of land covered by a lake, went no further than the declaration of witnesses, that the claimants, and those under whom they claimed, had had exclusive possession for that length of time; but how and to what extent,—whether the lake, or any part of it, was inclosed by fences, dams, walls or weirs, and how the possession was manifested, — there was nothing to show: *Held,* that the evidence was not sufficient to show such possession.

8. CONVEYANCE—*description by reference to plat.* Where lands are purchased and conveyed in accordance with a plat, the purchaser will be restricted to the boundaries as shown by the plat. Where a plat is referred to in a deed as showing the premises granted, such plat will become a part of the conveyance, as much so as if it had been copied into the patent or deed.

APPEAL from the Circuit Court of Morgan county; the Hon. CYRUS EPLER, Judge, presiding.

Fractional section 16, in township 16, north, of range 13, west of the third principal meridian, in Morgan county, being a school section, was platted by the trustees of the township, in April, 1846, and the platted lands advertised for sale by the school commissioner of the county, November 21, 1846.

The plat and valuation as made and reported by the trustees to the commissioner, as shown by the record of the county, are here given:

None of the lots shown by the plat were sold at the time the sale was advertised, for want of bidders; and in March, 1850, the township trustees vacated their first valuation, but not their plat, and re-valued the lots.

It was shown, by a patent issued by the Governor of this State, to Edward Watson, March 3, 1856, that on November 12, 1855, the school commissioner of the county sold to

Edward Watson that part of section 16, township 16 north, range 13 west, (said section having been granted by the United States to the State of Illinois, for the use of the inhabitants of said township, for school purposes,) designated on the map of the section, as made by the trustees, as lots 12 and 13, containing $22\frac{4}{100}$ acres by survey, and granted those lots, with their appurtenances, in fee simple, to the grantee named. Edward Lusk testified that he bought at the commissioner's sale of school lands, and had patented to himself, all those parts of the section designated on the map as lots, 3, 4, 5, 6, 7, 8, 9, 10 and 11. He did not produce his patent,—said he had looked for it, but could not find it,— nor was any record of it produced; but upon examination of the patent issued to Watson, Lusk testified that his patent was like Watson's, except as to description and name.

The plaintiffs (appellants here) were admitted to be trustees of township 16 north, range 13 west, and, as such, brought ejectment against David Schroll, Samuel Boles and Letitia Watson, partners, as Schroll, Boles & Co., claiming in fee "all that part of section No. 16, in township 16 north, range 13, west of the third principal meridian, lying east of lots 1, 2 and 3, in said section, and west of lots 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13, in said section." Upon issue joined, a jury was waived, a trial had by the court, and judgment for the defendants.

Plaintiffs offered in evidence section 6 of the act of Congress of April 18, 1818, known as the "Enabling act," and the ordinance of the Illinois Constitutional Convention of August 26, 1818, accepting the enabling act, and rested. The defendants offered in evidence the record of the platting and valuation of the section, and its being advertised for sale in 1846, and the re-valuation in 1850, before spoken of, and also the patent to Watson, to lots 12 and 13, and the evidence of Lusk as to his purchase, and receiving a patent from the State for lots 3 to 11, inclusive, as before stated. Defendants

also offered in evidence the record of a deed said to have been made by Lusk and wife to Carver and Mauck, conveying lot 3 in said section; but this deed, as it appears in the record, contains no grantee or grantees, and purports to be a conveyance of lots 3, 4, 5, 6, 7, 8, 9, 10 and 11, in said section 16, containing $90\frac{69}{100}$ acres, except $2\frac{60}{100}$ acres off the south-east corner of the section, before conveyed to Henry W. Reiman and Fred A. Hillig, executors of the estate of Francis Reiman, deceased. They also offered in evidence the record of a deed from George M. Chambers and wife, to Robert Rhea, conveying lot 2 in said section, supposed to contain 57 acres; and also the deed of the county clerk of Morgan county, July 17, 1884, purporting, by the authority of the laws of this State relating to swamp and overflowed lands, and in obedience to an order of the county board of the county, to convey to David Schroll and Albert S. Boles, various parcels of land situate in sections 3, 9, 10 and 16, township 16 north, range 13 west.

The first parcel said to be part of section 16, is said to contain $84\frac{25}{100}$ acres, and is first said to be part of lot 14, although there is nothing in the record to show any part of section 16 had been platted as lot 14; but the specific description is by courses and distances. The initial point is the north-west corner of the section, shown by the plat to be on the east bank of the Illinois river, and the first calls are: Thence south thirty-one and one-half degrees west, seven chains, sixty-two links; thence south thirty-seven and one-quarter degrees west, six and three-tenths chains; thence south forty-three and one-quarter degrees west, three chains seventy-four links. To this point the line is projected in a south-westerly direction, seventeen chains, sixty-six links,— diagonally across the Illinois river, and into Brown county. The call then proceeds: Thence north forty-eight degrees west, eight chains, seventeen links; thence north fifty-three and one-half degrees west, five chains, sixty-one links; thence north fifty degrees,—but whether east or west is not stated,—seven

chains, seventy-six links. But whether the course in the last call was east or west, the subsequent calls do not close, and the parcel attempted to be described can not be located. It is, however, apparent that the premises attempted to be described, not only do not include the lands in controversy, but do not border thereon. And as the second parcel part of section 16, is described as 40 acres lying south of the first, the impossibility of locating the first, from the description given, renders the location of the second equally impossible.

One of the defendants (Schroll) testified, as a witness, that as to lots 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11, Edward Watson had possession of them over twenty-five years ago, and held possession till he died, about 1860; that Watson was a fisherman, and also had exclusive possession of that part of Meredosia lake lying in section 16; that after Watson's death a company was formed, composed of Watson's widow, son and witness, as Watson & Co.; that the latter firm had possession of the lots named, and the lake, till the son's death, about ten or eleven years ago, when the defendant firm of Schroll, Boles & Co. was formed, since which time the defendant firm had had possession of lots 4, 5, 6, 7, 8, 9, 10 and 11, under an arrangement with Mrs. Watson, one of the firm of Watson & Co., and of lots 2 and 3 under written leases from the owners, but not producing the leases; and that defendants were not in possession of lot 1. The witness Wackerle testified, that he understood Hodges, Carver and Rhea owned lots 1, 2 and 3, and that Watson, Watson & Co., and the defendant firm, had been in the exclusive possession of that part of the lake sued for, for twenty-five years; and as to the possession of the lake, he was corroborated by Welscheimer and Lusk. The plaintiffs objected to all the evidence offered by the defendants, and each part of it, but their objections were overruled.

Messrs. CALLON & EPLER, for the appellants:

Appellants are entitled to the land in controversy as a part of section 16, unless it is shown that prior to the commencement of this suit the same was sold by the proper officers according to law. Being school land, and vested in the State for the use of schools, it could not pass to the county as swamp land, as the United States had divested itself of the same before the passage of the act relating to swamp lands. But aside from this, the description in the deed made by the county clerk, clearly failed to cover the lands in controversy.

As to the defence of the Statute of Limitations, it is sufficient to say the statute does not run against the public.

The second ground of defence is, that the parties who had purchased the lands bordering on the lake, took, under their deeds, to the centre of the lake. The lots sold by the school officers were sold by a plat, which showed lots from 1 to 3 on the west bank of the lake, and lots from 4 to 13 on the east bank of the lake. The lots were surveyed and platted, and the number of acres in each was ascertained, and when sold were sold for the exact number of acres as shown by the plat.

The parties who purchased these lots took the number of acres mentioned in the plat, and no more. The area named in the plat will govern. *McCormick* v. *Huse,* 78 Ill. 363.

It is a general rule that a boundary upon a natural pond or lake carries title, not to its centre, but only to low water mark. *Wheeler* v. *Spinola,* 54 N. Y. 377; *Waterman* v. *Johnson,* 13 Pick. 261.

Messrs. MORRISON & WHITLOCK, for the appellees:

The lands abutting the lake on both sides were platted and sold by the trustees of schools more than twenty years before this suit was brought. The parties purchasing these lots, between which the land in suit is supposed to lie, having taken possession of the lots, supposed they also had title to the

water intervening, and this view was acquiesced in by the trustees of schools until this late day.

This lake is a stream of water emptying into the Illinois river, about five miles in length, and is navigable, at times, for boats. We therefore insist that the appellants, by their officers and trustees, having platted the land to the margin of the lake, and sold them, are now estopped from claiming the lake intervening. In other words, they have sold the lands underlying the water, as well as the land adjoining it. *Seaman* v. *Smith,* 24 Ill. 521; *Braxton* v. *Bressler,* 64 id. 488; *Hubbard* v. *Bell,* 54 id. 110; *Trustees* v. *Haven,* 5 Gilm. 548; *Middleton* v. *Pritchard,* 3 Scam. 510; *Stolp* v. *Hoyt,* 44 Ill. 219; *Chicago* v. *Laflin,* 49 id. 172; 2 Washburn on Real Prop. 677, 678, 680, 681; *Ice Co.* v. *Shortall,* 107 Ill. 46.

It may reasonably be supposed that the principal reason for any one purchasing said lands on the banks of the stream, was the advantages of fishery; and it is evident that appellants can have no other reasons for now attempting to resurrect that long dormant claim to this "land," but for the purposes of fishery. To permit this to be done, would, we insist, be to permit one to take an advantage of his own wrong. It would be neither good morals nor good law.

We recognize the doctrine, that, as a rule, the Statute of Limitations does not run against the public; but that rule is not always applicable to municipal corporations. *Lessees* v. *Presbyterian Church,* 8 Ohio, 298; *Cincinnati* v. *Evans,* 5 id. 594; *Jersey City* v. *State,* 1 Vroom, 421; *Cross* v. *Morristown,* 18 N. J. Eq. 305; *Galveston* v. *Menard,* 23 Texas, 349; *School Directors* v. *Georges,* 50 Mo. 194; *Baker* v. *Johnson,* 33 Iowa, 151; *Alves* v. *Henderson,* 16 B. Mon. 151; *Kelley's Lessees* v. *Greenfield,* 2 Har. & McH. 132.

It being supposed by all that the lots sold embraced the intervening stream, the purchasers of these lots took possession, not only of the lots, but also of the lake between them, and they and their grantees have held the same ever since.

If the Statute of Limitations is ever to be invoked for repose, this is a proper case for its application.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

Fractional section 16 was, by the United States, "granted to the State, for the use of the inhabitants of such township, for the use of schools." Enabling act of Congress, April 18, 1818, 3 U. S. Stat. at Large, 428; Organic Laws of Illinois, (1 Gross' Stat.) 19. And this enabling act was formally accepted by an ordinance of the Constitutional Convention of August 26, 1818. (Laws of Illinois, 1819, appx. 21; Organic Laws of Illinois, 1 Gross' Stat. 20.) The enabling act and ordinance constituted, as this court held in *Bradley* v. *Case,* 3 Scam. 585, a solemn compact between the United States and this State, whereby the State of Illinois became the purchaser of the school sections, for a valuable consideration, with full power to sell or lease the same for the use of schools, as the State might provide and think most beneficial to the inhabitants of the respective townships.

Sections 16 in the several townships in the State having been granted and accepted as above stated, were not public lands, within the act of Congress of March 30, 1822, (3 U. S. Stat. at Large, 659,) authorizing the State "to survey and mark through the public lands of the United States, the route of the canal connecting the Illinois river with the southern bend of Lake Michigan." *(Canal Trustees* v. *Haven,* 5 Gilm. 548.) And for the like reason we must hold that they were not "swamp and overflowed lands, made unfit thereby for cultivation," remaining "unsold at the passage of" the act of Congress of September 28, 1850, (9 U. S. Stat. at Large, 519,) being "An act to enable the State of Arkansas, and other States, to reclaim the swamp lands within their limits." After the grant in 1818, they ceased to be public lands of the United States, nor could they, after that time, be regarded as unsold lands, and so they were unaffected by the swamp land

act. When, therefore, the defendants in this case offered in evidence the deed of the county clerk of Morgan county, purporting to have been made by order of the county board of that county, on the authority of the laws of this State relating to swamp and overflowed lands, and to convey parts of this school section, the offer should have been denied, and it was error in the circuit court not to have sustained the plaintiff's objection. And this is so, independent of all question as to whether the uncertain and defective description of the premises said to be part of this particular section, rendered the deed inoperative to that extent, or whether the premises attempted to be conveyed formed any part of the lands sued for, or bounded thereon. When, therefore, the official character of appellants was admitted, and the enabling act and ordinance of acceptance had been offered in evidence, appellants' right of recovery was complete, unless it could be shown that the State had parted with the title to the lands described in the declaration, or that the township authorities had parted with or lost their right of possession in the same.

It is contended by appellees that Meredosia lake is a stream of water, some five miles in length, and emptying into the Illinois river, and that appellants, by the proper officers, having platted and sold the land to the margin of and bordering on the stream, the grantees took to the middle of the stream; that the title of such grantees is an outstanding title, and appellees being shown to be in possession under such grantees, rightfully prevailed in the circuit court, and ought to prevail here. The books and authorities are all agreed, that streams and bodies of water within the ebb and flow of the tide, are, at common law, navigable, and the riparian proprietor's title does not, speaking generally, extend beyond the shore. And it is equally well settled, that grants of land bounded on streams or rivers above tide water, carry the exclusive right and title of the grantee to the centre of the stream, *usque ad filem aquæ,* subject to the easement of navigation in streams

navigable in fact, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the stream. 3 Kent's Com. 427; 2 Hilliard on Real Prop. 92; Angell on Water-courses, sec. 5; *Jones* v. *Soulard*, 24 How. 41; *State of Indiana* v. *Milk*, 11 Fed. Rep. 389; *Canal Appraisers* v. *The People*, 17 Wend. 596; *Child* v. *Starr*, 4 Hill. 369; *Seaman* v. *Smith*, 24 Ill. 521; *Rockwell* v. *Baldwin*, 53 id. 19; *Braxon* v. *Bressler*, 64 id. 488; *Washington Ice Co.* v. *Shortall*, 101 id. 46. But an entirely different rule applies when land is conveyed bounded along or upon a natural lake or pond. In such case the grant extends only to the water's edge. Angell on Water-courses, secs. 41, 42; 3 Kent's Com. *429, note a,—citing *Bradley* v. *Rice*, 13 Me. 201, and *Waterman* v. *Johnson*, 13 Pick. 261. See, also, *Warren* v. *Chambers*, 25 Ark. 120; *State of Indiana* v. *Milk*, (U. S. Cir. Ct. Dist. Ind., Gresham, J.) 11 Fed. Rep. 389,—citing *Wheeler* v. *Spinola*, 54 N. Y. 377, *Mansur* v. *Blake*, 62 Me. 38, *State* v. *Gilmanton*, 9 N. H. 461, *Paine* v. *Wood*, 108 Mass. 160, *Fletcher* v. *Phelps*, 28 Vt. 257, *Austin* v. *Rutland Railroad Co.* 45 id. 215, *Boorman* v. *Sunnuchs*, 42 Wis. 233, *Desplains* v. *Chicago and Northwestern Ry. Co.* id. 214, and *Seaman* v. *Smith*, 24 Ill. 521. See, also, *Nelson* v. *Butterfield*, 21 Me. 229; *West Roxbury* v. *Stoddard*, 7 Allen, 158; *Canal Co.* v. *The People*, 5 Wend. 423; *Jakeway* v. *Barrett*, 38 Vt. 316; *Primm* v. *Walker*, 38 Mo. 99; *Wood* v. *Kelley*, 30 Me. 47.

The line of defence adopted by appellees, as before stated, presupposes the existence of certain facts, viz.: First, that appellants, being owners of section 16, granted the lands abutting upon the water spoken of as Meredosia lake, within such section, bounding such grants along or upon the margin of such water; second, that Meredosia lake is not, at the common law, navigable; third, that Meredosia lake, and within the bounds of section 16, is a stream or river, as contradistinguished from a lake; and fourth, that the terms of the grant do not clearly denote an intention to stop at the

edge or margin of the stream. If the record in this case shows the existence and concurrence of all these facts, this judgment, upon the authority of the cases cited, may be affirmed; but if it shall appear that the case made by the record does not show the existence of the supposed facts, reversal must follow.

It is not pretended that Meredosia lake is a stream or body of water navigable at common law,—that is to say, it is not within the ebb and flow of the tide,—and hence the rules of law applicable in such case can not be invoked. The contention is, that Meredosia lake is a stream of water about five miles long, emptying into the Illinois river, with its southern extremity and outlet within the bounds of section 16.

A careful examination of the record shows that this lake is a natural body of water, five or six miles long, and in some places a mile in width; that it is fed by springs; that its southern extremity extends into section 16; that it has no connection with any stream of water, except by a slough at the south end, and near the south line of section 16; that the body of the lake, in its natural state, is without current, but that during portions of the year a current of water passes from the lake, through the slough referred to, into the Illinois river, which flow, however, is stopped in the summer. The record does not show the average width of the lake, the average depth of the water in the lake in its natural state, nor whether or not it is in fact navigable, nor are we able to learn therefrom the length and width of the slough, nor the depth of the water flowing through the same, or the rapidity of the flow from the lake into the river at the natural stage of water in the lake. All we can know of this outlet we must gather from the plat made by the township trustees in 1846, taken in connection with the fact testified to by witnesses, that for a portion of the year some water from a land-locked natural body of currentless water, five or six miles long, and in places a mile in width, flows therethrough, and from this, alone, we are asked

to find and hold that such a body of water so situated is a stream, and not a lake.    This, as we understand the law, we can not do.

The word "stream" has a well-defined meaning, wholly inconsistent with a body of water at rest.    It implies motion, as, to issue in a stream,—to flow in a current.    (Webster's Dictionary.)    Indeed, the controlling distinction between a stream and a pond or a lake is, that in the one case the water has a natural motion,—a current,—while in the other the water is, in its natural state, substantially at rest.    And this is so, independent of the size of the one or the other.    The flowing rivulet of but a few inches in width is a stream as certainly as the Mississippi.    And when lands are granted by the proprietor of both land and stream, bounding such grant upon the stream, the grantee acquires right and title to the thread or middle of the stream.    This right is grounded upon the presumption that the grantor, by making the stream the boundary, intended his grantee to take to the middle of the stream; and this presumption will prevail until a contrary intent is made to appear.    (*Rockwell* v. *Baldwin*, 53 Ill. 19.) The right spoken of does not rest upon the principle that when a grant is bounded on a stream, the bed of the stream to the thread or middle passes as incident or appurtenant to the bordering land, for the bed of the stream is land, though covered with water, and land can not pass as appurtenant to land.    As is said in *Child* v. *Starr*, 4 Hill. 369 : "A convey-ance of one acre of land can never be made, by any legal construction, to carry another acre by way of incident or appurtenance to the first."    The riparian proprietor claiming to the thread or middle of the stream must show the border-ing water *to be a stream*, and that his grant, in terms or legal effect, is bounded upon or along such stream,—that the stream is made the boundary.    And while it is obvious that a cur-rentless body of water can not be a stream, the fact of some current in a body of water, is not of itself, in every instance, .

sufficient to determine its character as a stream, as distinguished from a pond or lake. The presence of some current is not enough, alone, to work an essential change in so essentially different things as a stream and a lake, for a current from a higher to a lower level does not necessarily make that a stream or river which would otherwise be a lake; nor the swelling out of a stream into broad water sheets does not necessarily make that a lake which would otherwise be a river. Angell on Water-courses, sec. 4.

We are, therefore, constrained to hold, that the position, size and character of this body of water, as shown by this record, fixes its character as a lake, and not a stream, notwithstanding some part of its water, during a portion of the year, may flow through the slough into the Illinois river.

Another fact, the existence of which is presupposed, is, that the proper officers, acting under the laws of the State, granted the lands bordering on so much of the stream called Meredosia lake as was within section 16, bounding such grants on the stream. The only grants shown in this record to have been made, and upon which this contention could be based, are the patents issued to Edward Watson and Edward Lusk. Watson took, under his patent, that part of section 16 designated on the plat of the section made by trustees, as lots 12 and 13, containing $22\frac{4}{100}$ acres, by survey, and Lusk took, under his patent, lots 3 to 11, inclusive, by the same plat, containing, by the plat, $88\frac{75}{100}$ acres. By reference, the plat of the section made by the trustees in 1846, became a part of the conveyance, as much so as if it had been copied into the patent deed. (*Piper* v. *Connelly*, 108 Ill. 646; *Louisville and Nashville Railroad Co.* v. *Koelle*, 104 id. 455.) And the rule of law is, that when lands are purchased and conveyed in accordance with a plat, the purchaser will be restricted to the boundaries as shown by the plat. (*McCormick* v. *Huse*, 78 Ill. 363,—citing *McClintock* v. *Rogers*, 11 id. 279.) The patent deeds contain no intimation that the lots conveyed

border on a lake or stream, and when we look at the plat, as we must, all we can determine, is the shape and area of the several lots. No data is given from which we can determine the width or depth of any lot; nor can we know from the plat that either the east line of lot 3 or the west line of lots 4 to 13, inclusive, as shown on the plat, are, in fact, the western and eastern boundary of Meredosia lake. It may be so, in fact, but this record fails to show it to be so, while as to lots 1 and 2 the record does not show that they were at any time sold or conveyed, or the title vested in the State in any way divested. We therefore hold, that it does not appear, by the record, that the State, for the inhabitants of the township, granted all the lands bordering on Meredosia lake, and within this fractional section 16, nor that the grants, to the extent they were made, were bounded on the lake.

It is thus seen that the essential facts, the existence of which is presupposed as a basis for the defence interposed, are not shown to exist, and hence the defence based on the right as riparian owners on streams to take *ad filem aquæ*, can not be invoked, and has no application to this case. For the reasons stated, all the evidence offered by appellees, on the trial, relating to the title, ownership and possession of the lots shown by the trustees' plat, should have been refused as immaterial, and its reception, over the objection of appellants, was error.

One other question remains to be considered, viz.: Appellees claim that they are in possession "of a portion of water known as Meredosia lake, claiming title to it by possession for more than twenty years, as fishermen." Appellants sue for a body of land. Some part of the premises described in the declaration must form the bed of that part of Meredosia lake within section 16, but what part is lake-bed, and what shore, we can not determine from this record. Appellees' claim of title by possession is not of *land*, but of water. But if this should be thought hypercritical, and it be assumed that

appellees' claim is of twenty years' adverse possession of the bed of the lake within the section, still it must be observed that such possession of land as here claimed, is a conclusion of law arising from existing facts. The evidence preserved in the record goes no further than the declaration of witnesses that appellees, and those under whom they claim, had, and had had, exclusive possession for that length of time; but how, and to what extent,—whether the lake, or any part of it, was enclosed by fences, dams, walls or weirs, and how this adverse dominion was manifested,—there is not one word to show. The claim, under this proof, is without force or merit.

The judgment of the circuit court is reversed and the cause remanded. *Judgment reversed.*