DONALD L. SMITH, Plaintiff-Appellant, *v.* THE CITY OF GREENVILLE *et al.*, Defendants-Appellees.

Fifth District    No. 81—504

Opinion filed May 10, 1983.

George H. Huber, of Vandalia, for appellant.

Meyer & Meyer, of Greenville, for appellee City of Greenville.

James E. Buchmiller, Ltd., of Greenville, for other appellees.

JUSTICE JONES delivered the opinion of the court:

The central question before us is whether the plaintiff, Donald Smith, has riparian rights in Governor Bond Lake.

Construction of the lake, which is owned by one of the defendants, the city of Greenville, was completed in 1969. The plaintiff owns a 40-acre tract lying to the west of the lake. A ditch on the eastern edge of his property carried water from his property into the newly created lake, and at times water backed up onto plaintiff's property from the lake. As a result of the construction of the lake and the subsequent movement of water between plaintiff's property and the lake, a 25-acre tract to the south became inaccessible from the north. The defendants Elvin and Kathryn Miller owned the 25-acre tract at the time and sold it in 1977 under a contract for deed to the defendants Phillip and Frances Schildknecht. To provide access to the 25-acre tract, in 1972 Elvin Miller built a roadway about seven feet high that ran north and south between plaintiff's property on the west and the lake on the east. A 48-inch culvert, running east and west, was installed under the roadway to accommodate the water passing between plaintiff's property and the lake. The west end of the culvert lies six to eight feet east of plaintiff's east property line. The roadway is located in LaGrange Township.

Plaintiff sought injunctive relief to compel removal of the roadway because of its alleged interference with the exercise of his riparian right of access to the water of the lake. Following a hearing the trial

court found that "plaintiff's land had no water on it from the lake at times of normal pool" and expressly ruled that plaintiff "was not and is not a riparian owner." Plaintiff appeals raising three issues: (1) whether the finding of the trial court that plaintiff was not a riparian owner was "contrary to the weight of the evidence and contrary to law"; (2) whether "the order of the court was contrary to the manifest weight of the evidence in the trial court's finding that the Governor Bond Lake at Greenville, Illinois, did not lie in part upon the land of the Plaintiff"; and (3) whether "the Constitution of the State of Illinois and of the United States was violated by the taking of the Plaintiff's property without compensation."

Inasmuch as two of the three issues plaintiff raises call for a review of the evidence, we turn our attention first to a serious omission in the record. Missing from the transcript of proceedings is the testimony of all but one of the witnesses called by the defendants, a hiatus, according to the briefs, of 94 pages, constituting about one-seventh of the entire transcript of proceedings. In his reply brief plaintiff indicates that the omission occurred because of fault on the part of the court reporter and argues that the plaintiff should not be made to "bear the consequences" of the court reporter's failure to prepare, file, and mail the transcript. However, plaintiff has failed to prepare a certified report of proceedings from the best available sources or to stipulate as to the facts material to the controversy, as provided by Supreme Court Rule 323 (87 Ill. 2d R. 323), in place of a verbatim transcript.

The burden is on the appellant, here the plaintiff, to present a record sufficiently complete that a reviewing court can question the quantum of evidence pertaining to an issue of fact. (*Investors Shelter Corp. v. Chernick* (1978), 58 Ill. App. 3d 446, 374 N.E.2d 786.) When portions of the record are lacking it will be presumed that the trial court acted properly in the entry of the challenged order and that the order is supported by the part of the record not before the reviewing court. (*Glover v. Glover* (1974), 24 Ill. App. 3d 73, 320 N.E.2d 513.) Otherwise stated, the rule is that in the absence of a proper record, it is presumed that sufficient evidence was presented to support the trial court's judgment and, thus, to require affirmance of that judgment. *Investors Shelter Corp.*

■ Without indulging in this presumption, however, we conclude from our examination of that part of the record plaintiff has furnished us, in conjunction with relevant case law, that the judgment of the trial court was not against the manifest weight of the evidence and was properly entered in favor of the defendants. Before we set forth

those facts adduced at the hearing pertinent to the question of plaintiff's riparian ownership, we turn to the case law to which these facts must be applied.

In *Bouris v. Largent* (1968), 94 Ill. App. 2d 251, 256, 236 N.E.2d 15, 18, the court described the riparian right of access to a body of water as dependent upon whether the property touches the water:

> "The riparian right of access to a body of water depends on whether the property touches the water thereby enabling access to the water to be gained without going over property of others. Such right of access does not depend upon ownership of or title to the submerged land. Consequently such right is not affected by description of the property unrelated to the body of water. It is only necessary that the description of the property include or encompass the shore line."

In Illinois the rule for determining a riparian proprietor's title to land bounded by a stream or river differs markedly from the rule for determining a riparian proprietor's title to land bounded by a lake or pond. In *Trustees of Schools v. Schroll* (1887), 120 Ill. 509, 518-19, 12 N.E. 243, 244-45, the court contrasted the two rules:

> "[G]rants of land bounded on streams or rivers above tide water, carry the exclusive right and title of the grantee to the centre of the stream, *usque ad filem aquae,* subject to the easement of navigation in streams navigable in fact, unless the terms of the grant clearly denote the intention to stop at the edge or margin or the stream. [Citations.] But an entirely different rule applies when land is conveyed bounded along or upon a natural lake or pond. In such case the grant extends only to the water's edge. [Citations.]"

One reason for the rule that a riparian proprietor whose property is bounded by a lake takes only to the water's edge is set forth in *Fuller v. Shedd* (1896), 161 Ill. 462, 483, 44 N.E. 286, 293:

> "The grant of land on a lake would, on the instant of the grant, be a conveyance to the center of the lake, if the same rule existed as with reference to rivers. The determination of boundary lines to the center of the river is not attendant with any serious difficulty, but the irregular borders of a lake would render the determination of lines in the bed of the lake between riparian proprietors of almost impossible solution."

In a conveyance calling for a lake as a boundary line, the boundary line is that line at which the water usually stands when free from disturbing causes. (*Brundage v. Knox* (1917), 279 Ill. 450, 117 N.E. 123; *City of Chicago v. Ward* (1897), 169 Ill. 392, 48 N.E. 927; *Sea-*

*man v. Smith* (1860), 24 Ill. 521.) The court in *Brundage v. Knox* said of this rule, "This rule as laid down in [*Seaman v. Smith*] has always been referred to with approval and repeatedly quoted by this court as the rule applying to the boundary line of Lake Michigan or other fresh water lakes in this State." (279 Ill. 450, 470, 117 N.E. 123, 130.) Still examining *Seaman v. Smith*, the *Brundage* court said further that "[i]t is clear from the reasoning and conclusion in that case, in the light of the judgment entered, that it was not the high-water mark that was taken as the true limit of the boundary line, but the line where the water usually stood when unaffected by storms or other disturbing causes." 279 Ill. 450, 471, 117 N.E. 123, 130.

▮ The boundary line of Governor Bond Lake, then, is the line at which the water usually stands when unaffected by storms or other disturbing causes. To be a riparian owner plaintiff must own property that touches the lake at its boundary line as so defined. Bearing in mind these principles, we examine the evidence adduced at the hearing.

The plaintiff called several witnesses, including defendants Elvin Miller and Phillip Schildknecht, called under section 60 of the Civil Practice Act, in effect at the time of the hearing (Ill. Rev. Stat. 1981, ch. 110, par. 60). The testimony of Phillip Schildknecht was not pertinent to the question of plaintiff's riparian ownership. Elvin Miller, however, testified that normal pool of the lake is determined by the level of water at the spillway on the lake. At normal pool the water is at the top of the spillway. A benchmark showing normal pool is available for surveying purposes. At normal pool no water runs through the spillway "except the spring that flows all the time." Once he measured water that had backed up in the ditch on plaintiff's property. The water, which was confined to the ditch, was 3½ feet deep and was backed up on plaintiff's property for a distance of 17 feet. That same morning, he said, his 3½-inch rain gauge was full from a storm the night before. It took several days for the water to recede. He saw the water that far back on plaintiff's property only the one time. Lake water had backed up in this manner on plaintiff's property, he said, only at flood stage, apparently once or twice a year. He testified further that there was "[n]ot too much" erosion from the roadway he had built, which he described as "pretty well sodded." He said that "a lot more" silt comes from fields, under cultivation in the area, that are drained by the ditch on plaintiff's property. Silt comes also, he said, from the hillside from which he had removed dirt to build the roadway. He had sold about a hundred acres of his land to be used for Governor Bond Lake. As damages to the 25 acres rendered inaccessi-

ble from the north as a result of construction of the lake the city had paid him $125 per acre. He had asked the plaintiff if he could use plaintiff's land to take his farm machinery to the 25-acre tract. In response plaintiff had, the defendant said, "told me to take a helicopter and fly it over."

Testifying in his own behalf, the plaintiff could not recall Elvin Miller's ever having asked him about using plaintiff's property to get to his 25-acre tract. He indicated that at normal pool the water of the lake comes just to the top of the spillway. The plaintiff testified that siltation has occurred on his property to a depth of between two and three feet at the deepest and that the silt decreases the depth and width of the lake water on his property. He could not recall the occurrence of "this type of silting" on his property before the road was built. Asked how deep the water was on his property when the lake was at normal pool before the roadway was built and before the siltation occurred, plaintiff answered that at normal pool "there would have been back on me in depth before any silting from the construction and all, approximately, three feet plus" for a distance of "a short sixty feet" at a width of about 10 feet. Plaintiff testified that before the road was built he had fished on his property but the silt had "destroyed the water level; reduced it." The roadway, he said, "aborts *** completely" his access to the lake. In the fall of 1971 he had put a 15-foot boat into the lake water on his property, which by his estimate extended at the time onto his property for a distance of 17 feet.

Plaintiff was recalled to testify following a two-month recess of the court, after which the court was to view the site in issue. In the interim, however, plaintiff had had the area of the ditch dug out by "a caterpillar which was a bulldozer." Asked whether he had changed the premises in question by having had it dug out, the plaintiff answered, "To a portion, yes." As a result of this digging the area was, according to plaintiff, restored to its "originality." As a result of the digging the area is, by plaintiff's testimony, a foot and a half to three feet deeper than the culvert. As a consequence water stands on his property, he said, whether or not there is water in the culvert, which drains the ditch into the lake from west to east. On cross-examination plaintiff explained his conduct:

"Q. [James Buchmiller] Mr. Smith, why did you go out and dig this property up since we were in court the last time, knowing we would be back in court today?

A. Well, as I stated previously, that is my property, Mr. Buchmiller. And also, I feel there that I would be helping the others on the other side of that with this silt to give it a place to de-

posit on me there. I would help Mr. Schildknecht, Mr. Rasher, anyone else on the east side of that dam [roadway], with any silt that would be coming down through there and going through the culvert.

\* \* \*

Q. And you have decided since we were in Court the last time and prior to coming back to Court today that you are going to help out the man you're suing, Mr. Schildknecht, by creating a basin for silt, is that your answer?

A. Yes.

Q. You did this out of the goodness of your heart to help Mr. Schildknecht, the man you're suing?

A. This was to help out, as I say, anyone that comes downstream from there.

\* \* \*

Q. \*\*\* I am trying to get at your motivation or reason for digging up this property while we're in Court for this property just to help other people downstream. Is that your only reason?

A. Mr. Buchmiller, I think that's a big reason. If people had been more neighborly to me out there, we wouldn't be up here arguing around with this situation.

Q. You're doing this as a neighborly act to Mr. Schildknecht?

A. Anyone down there can benefit by it.

\* \* \*

Q. \*\*\* Is that the only reason? Just answer that simple question.

A. To help myself and to help the neighbors or the friends that have —."

The cost of this excavation, plaintiff said, was $375.

One of plaintiff's other witnesses, Harold Krummel, a friend of plaintiff, testified that he had visited the area of plaintiff's property in question on three different occasions and had seen water in the ditch every time. He said that he had seen water extending onto plaintiff's property for a distance of about 60 feet at a width of 40 or 50 feet at the widest point and that a pole used as a measure indicated water about two feet deep and mud about two feet deep in the center of the ditch, apparently at its lowest point. On cross-examination the witness recalled that there had been "rains" prior to the visit in which he had poled the depth of the water. He did not know how high the water had been at the spillway at the time or how long the water had remained on plaintiff's property.

The plaintiff's brother, Byrle Smith, testified in behalf of his

brother. He described the ditch after it had been dug out as about 12 feet wide, that is, about "two feet wider than what the banks would have been before." He said it had been "dredged out" for a distance of about 120 feet. After having been dug out, it was "[a]nywhere from a foot to eighteen inches deeper than where the bottom of the water would be in the water basin."

Plaintiff called as a witness James Buchmiller, the attorney representing all of the defendants except the Schildknechts. He had represented the city of Greenville at the time the lake was being developed. He testified that at one time he had recommended in writing that plaintiff's 40-acre tract be condemned in conjunction with the construction of the lake because of plaintiff's refusal to sell the property. The witness explained that the city had not condemned it for the reason that the engineers "would have liked to take all around the lake, but they realized we couldn't afford it." The engineers had wanted to take more property than actually was taken, in part to protect the intake area of the lake from runoff, pollution, and siltation from cultivation. Another reason the witness gave for their wanting to take more property was to provide access to the lake at certain points recommended by the engineers. The witness indicated that the recommendation to condemn plaintiff's property had nothing to do with its elevation with reference to that of the lake.

Plaintiff called as a witness Edward Kunneman, who appears to be employed by a surveying firm, in an effort to show the inaccuracy of aerial photographs in determining elevation. The testimony of the witness was inconclusive.

Also called as a witness by plaintiff was Paul Clinebell, a consulting engineer. He testified that the spillway of the lake has an elevation of 524.5 feet and that the elevation of the lake at normal pool is expected to be the same as that of the spillway. He stated that, at normal pool, elevation of 524.5 would cause land within the watershed at a lower elevation to be flooded when the lake is full. Interpreting a topographic map, designated as plaintiff's exhibit No. 118, which had been produced by the use of aerial photographs, he said that the lowest elevation on plaintiff's property is 526 feet, which is the elevation of the ravine or ditch. The exhibit bears a "PHOTO. DATE" of March, 1964. The witness testified that at normal pool of 524.5 feet no water from the lake would be standing on any portion of plaintiff's property and that the water would have to rise about a foot and a half above the level of the spillway before it would touch plaintiff's property. At normal pool, he said, the water of the lake extends to a point about 25 feet east of plaintiff's east property line. At normal

pool it would not be possible to put a boat on plaintiff's property and convey it by water onto the lake. Nor would plaintiff's property be a good place to fish in view of the fact that "[t]here would be no water there most of the time." He testified that plaintiff's land would be flooded on an average of once every 50 years but that there would be water on it at more frequent intervals, though for very short periods of time, that is, for a matter of days, not months. As the ravine or ditch is shown, apparently on plaintiff's exhibit No. 118, he would not expect "a great deal" of sediment, which he described as one to two feet of sediment, above the level of 524.5 feet. He testified that, of all the exhibits of plats, plaintiff's exhibit No. 118 was the most accurate.

The defendants called as a witness Curt Benzel, possibly "Denzel," whose testimony is all that has been provided to us of the defendants' evidence. The witness had surveyed some of the property of Elvin Miller, who was at the time the witness' father-in-law. The witness had prepared a street plan, designated as plaintiff's exhibit No. 116, in which the normal pool elevation of 524.5 feet is shown on plaintiff's property. The witness testified that this figure was incorrect as an elevation for the ditch because "the water line does not go up onto the property as far as it shows here." He explained that when he did the drawing he was not concerned with the normal pool elevation, the purpose of the drawing being to show the proposed roadway and the scope of it. The roadway is 60 feet wide as shown on the drawing. He testified that the elevation of the west end of the culvert when it was installed was 524.5 feet, that is, normal pool; the elevation at the bottom of the east end of the culvert was 524.0 feet, six inches below normal pool. Interpreting plaintiff's exhibit No. 118, the witness testified that the normal elevation of the lake of 524.5 feet would lie about 30 feet east of the plaintiff's east property line, approximately in the center of the roadway. On cross-examination he testified that the presence of vegetation can cause aerial photographs to be in error as to elevation by as much as one to two feet and that there was vegetation along the east line of plaintiff's property. He said that he had lived for five years in a subdivision to the north of the area in question and that once or twice he had seen water on plaintiff's property about 100 feet wide after a heavy rain of two to three inches. He had, he said, "made it a point a couple of times of trying to get down there after the rain to see what the culvert would do."

We need not reiterate the points on which the evidence is conflicting. The trial court resolved questions of credibility in favor of the defendants after having had the opportunity to observe the manner

and demeanor of the witnesses while testifying. In view of this fact and the evidence presented in that part of the record we do have, we cannot say that the judgment of the trial court was against the manifest weight of the evidence. The trial court did not err in finding that plaintiff's land had no water from the lake on it at times of normal pool. Because plaintiff's property does not touch the boundary line of the lake, defined as the line at which the water usually stands when unaffected by storms or other disturbing causes, he is not a riparian owner and has no riparian rights in Governor Bond Lake. In view of our determination that the plaintiff has not lost any of his property to the lake, we need not consider the third and final issue he raises with respect to the taking of his property without compensation.

Affirmed.

HARRISON, P.J., and KARNS, J., concur.