TRIPLETT (UNITED STATES v.). See Case No. 16,539.

TRIPP (FLANDERS v.).    See Case No. 4,854.

TRIPP (HARTSHORN v.).    See Case No. 6,168.

---

## Case No. 14,180.

### TRIPP v. SPRING.

[5 Sawy. 209.] [1]

Circuit Court, D. California.    July 29, 1878.

LAND GRANTS—BOUNDARY OF CITY OF SAN FRANCISCO—PUEBLO LANDS—TIDE LANDS—TREATY OBLIGATIONS.

1. According to the decree in the Pueblo Case, the Bay of San Francisco is the eastern boundary of the land confirmed to the city of San Francisco, the line being that of ordinary high-water mark as it existed on the seventh of July, 1846.

2. Mission creek constitutes no portion of the Bay of San Francisco. The boundary line of the tract confirmed crosses the mouth of all creeks running into the bay.

[Cited in Knight v. United Land Ass'n, 12 Sup. Ct. 274.]

3. The laws of Mexico, relating to lands to be assigned to pueblos, required that such lands should be laid out in a square or prolonged form, according to the nature of the country, and, so far as practicable, have regular lines for boundaries. The decree of the United States circuit court in confirming the claim of the city followed this requirement, and gave boundaries which could be easily ascertained, and which formed as compact a body as the situation of the country would permit.

4. The general doctrine that the state of California holds the title to soils under tide waters within her limits is asserted; but such title could only devolve upon her where it had not been previously granted to other parties by the sovereignty from which the United States acquired the country, or been subjected to trusts which require its disposition in some other way. If it were acquired by the United States charged with any trust, the disposition of it, in the execution of that trust, will override any claim of the state.

5. The obligation which the United States assumed by the treaty with Mexico, was to protect, all rights of property acquired under the laws of that country. The property rights of pueblos, equally with those of individuals, were entitled to protection, and in the legislation of congress provision was made for their investigation and confirmation. The right and power of the government in the execution of its treaty obligations to protect the claim of the city of San Francisco, as successor of the pueblo, were superior to any subsequently acquired rights or claims of the state, or of individuals.

6. The decree confirming the claim of the city having fixed the Bay of San Francisco at ordinary high-water mark as its eastern boundary, this line cannot be changed by the surveyor-general or any department of government. The act of congress of March 8, 1866 [14 Stat. 4], confirmed the claim as described in the decree, and also relinquished all interest of the United States to the lands embraced by it, subject to certain exceptions and reservations. Any patent of the United States which may hereafter be issued to the city from the land department at Washington, cannot affect the title already vested in the city and those claiming under it. The confirmation approved and affirmed by the act of congress will control any patent which the department may issue.

[Cited in Whitney v. Morrow, 112 U. S. 695, 5 Sup. Ct. 334; Knight v. United Land Ass'n, 12 Sup. Ct. 264.]

[Cited in Ohm v. City and County of San Francisco (Cal.) 28 Pac. 585.]

This was an action [by C. C. Tripp against F. S. Spring] for the possession of a parcel of land within the city of San Francisco. The case was tried at the July term of the court, before Mr. Justice Field, without a jury, by stipulation of the parties.

Philip G. Galpin, for plaintiff.

E. J. Pringle and A. Campbell, Sr., for defendant.

FIELD, Circuit Justice. This is an action for the possession of a parcel of land within the city of San Francisco, constituting a portion of the block bounded by Mission, Howard, Seventeenth and Eighteenth streets, and designated on the map of the city as block sixty (60). The plaintiff is a citizen of Illinois, and asserts title to the premises under a conveyance executed by the state board of tide land commissioners, in November, 1875, to one Geo. W. Ellis, through whom he derives whatever interest he possesses. The defendant is a citizen of California, and claims the ownership of the premises by conveyance from parties who acquired the interest of the city of San Francisco under the ordinance known as the "Van Ness Ordinance," and the confirmatory legislation of the state and of the United States. The case is believed to be a test one, and it is stated that upon its disposition numerous other cases, depending upon the efficacy of the deed of the tide land commissioners, will be determined. It is tried by the court without the intervention of a jury by stipulation of the parties.

The contention of the plaintiff is, that the premises in controversy were, on the admission of California into the Union, either lands covered by the tide waters of the Bay of San Francisco, and that their title then vested in the state, by virtue of her sovereignty; or that they were, upon such admission, salt-marsh lands, which at once passed to the state under the act of congress of September 28, 1850 [9 Stat. 519], known as the swamp land act; and that in either case, the title of the state was conveyed to Ellis by the deed of the tide land commissioners. The statute providing for the appointment of these commissioners makes their deed prima facie evidence of the regularity of their preliminary proceedings, and of their sale, and of title and right of possession in the grantee (Laws 1867–68, p. 720); and the plaintiff also contends that this prima facie evidence cannot be controverted in an action at law until the defendant has connected himself with the original source of title.

The premises are situated where formerly

---

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

was a stream called Mission creek, running into the waters of a bend in the Bay of San Francisco, known as Mission Bay. They are distant about a mile from the mouth of the creek. All of that stream which covered any portion of block sixty (60) is now filled in, and upon the land thus formed, and adjoining lands, several buildings have been erected, which are occupied as private residences. Whether the waters of the bay were ever carried by the tide over the lands is a matter upon which the evidence is conflicting. The creek was often swollen by water from the adjacent hills so as to overflow its banks, and the tide sometimes, though not regularly, forced back the waters of the creek, so as to cause a similar overflow. But from the view we take of the case, it is immaterial whether the lands could ever properly be termed tide lands or marsh lands, whether they were at any period covered by the daily tides, or lay beyond their reach at their highest flood. The record of the proceedings and the final decree in the Pueblo Case have been given in evidence, and from them it appears that the premises are situated within the limits of the tract confirmed to the city of San Francisco. This tract embraces so much of the upper portion of the peninsula, upon which the city is situated, above the ordinary high-water mark of 1846, as will contain an area of four square leagues, being bounded on the north and east by the Bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line, drawn so as to include the area designated, subject to certain deductions which it is not material to mention in this connection. Mission creek never constituted any portion of the Bay of San Francisco, any more than the Sacramento river constitutes a portion of the Bay of Suisun, or the Hudson river a portion of the Bay of New York. As the demanded premises lie where Mission creek formerly existed, or where its banks were, they necessarily fall within the tract confirmed to the city. The boundary of that tract runs along the bay on the line of ordinary high-water mark, as that existed in 1846, crossing the mouth of all creeks running into the bay, and that of Mission creek among others.[2]

The boundary would have been a very singular one had it followed the windings of that creek and its branches, wherever the tide waters of the bay may have flowed. The laws of Mexico relating to lands to be assigned to pueblos, required that such lands should be laid out in a square or prolonged form, according to the nature of the country, and so far as practicable, have regular lines for boundaries. The decree of the United States circuit court in confirming the claim of the city followed this requirement, and gave boundaries which could be easily ascertained, and which formed as compact a body as the situation of the country would permit.

The general doctrine that the state holds the title to soils under tide waters within her limits is not questioned. Her proprietary right to such soils has been asserted in numerous instances, both by the state and federal courts. It was expressly recognized by the supreme court of the United States in the recent case of Weber v. Harbor Commissioners, which originated in this city (18 Wall. [85 U. S.] 65). Though the United States acquired the title to the lands under tide waters from Mexico equally with the title to the uplands, they held it in trust for the future state. The ownership and consequent right of disposition passed to her upon her admission into the Union. But this ownership could, of course, only devolve upon her where it had not been previously granted to other parties by the former sovereign, or subjected to trusts which would require its disposition in some other way. If it were acquired by the United States charged with any trust, the disposition of it, in the execution of that trust, will override any claim of the state.

That a pueblo of some kind existed at the site of the present city of San Francisco upon the cession of the country from Mexico; that such pueblo possessed proprietary rights in certain lands, and that the city succeeded to such rights, are no longer open questions for discussion or judicial examination. They have been determined by repeated decisions of the federal courts; and however much counsel may be disposed to question the original soundness of those decisions, the conclusions reached must be re-

---

[2] This line of ordinary high-water mark was established by the municipal authorities of the city of San Francisco, in 1851, under what is known as the first "Water Lot Bill" (St. 1851, p. 307). The state, by that act, granted to the city of San Francisco, for ninety-nine years, the use and occupation of certain lands bounded on one side by the lines of certain streets, and on the other by "natural high-water mark;" and the statute provided that a "correct map of said boundary line, distinctly and properly delineated by a red line," should be deposited within thirty days after the passage of the act in the offices of the secretary of state, of the surveyor-general, and of the surveyor of the city of San Francisco. The outside red line was made by the act the water-front of the city, while the inside red line indicated the line of ordinary high-water mark. Between the two lines were the so-called beach and water lots, the use and occupation of which were granted to the city. It is matter of history that the survey was made as provided in the statute, the maps platted and red-lined, and deposited with the proper custodians, where they have ever since remained. By this well-known "red line map" all parties, since 1851, have been governed in the matter of determining the line of ordinary high-water mark. And this line, as shown by the above-mentioned map, crosses Mission creek and all the creeks and sloughs that in 1851 emptied into the Bay of San Francisco; but all of which, with the exception of a portion of Mission creek, have long since been filled up, and built over.

ceived as established, and all the legal consequences flowing from them accepted. The obligation which the United States assumed by the treaty with Mexico was to protect all rights of property acquired under the laws of that country. The property rights of pueblos, equally with those of individuals, were entitled to protection, and in the legislation of congress provision was made for their investigation and confirmation. The right and power of the government in the execution of its treaty obligations to protect the claim of the city of San Francisco, as successor to the pueblo, were superior to any subsequently acquired rights or claims of the state or of individuals. See Teschemacher v. Thompson, 18 Cal. 28.

It is undoubtedly true that, until the confirmation of the city's claim, the government retained the right to control the use and disposition of the pueblo lands, where, by action of the officers of the pueblo, or of the city, its successor, they had not been previously vested in private proprietorship; and, perhaps, had congress in terms so declared, the swamp lands within the limits of the pueblo may have been alienated to other parties. There is no occasion, however, to express any opinion on this point, as the only act of congress to which reference is made (that of September 28, 1850), was clearly not intended to apply to any lands then held by the United States, charged with the equitable claim of others, which they were by treaty bound to protect.

Our conclusion is, that the premises in controversy constitute a part of the tract confirmed to the city by the decree of the United States circuit court, entered on the eighteenth of May, 1865. That decree became final by the act of congress, passed on the eighth of March, 1866, which was followed by a dismissal of the appeal taken to the supreme court. The defendant has shown that the parties, through whom he claims, were in peaceable, actual possession of the lands in controversy at the time the Van Ness ordinance took effect, and on the passage of the confirmatory act of the legislature of the state, and had made valuable improvements upon it, and thus acquired the title of the city. He has thus brought himself in connection with a title superior to that of the plaintiff. It follows that judgment must be entered in his favor.

The suggestion that the survey of the peublo claim forwarded to the land department at Washington, follows the banks of Mission creek, cannot have any weight in the case. The decree confirming the claim of the city fixes the Bay of San Francisco at ordinary high-water mark as its eastern boundary, and this line cannot be changed by the surveyor-general, or any department of government. The act of congress confirms the claim as described in the decree, and also relinquishes all interest of the United States to the lands embraced by it, subject to certain exceptions and reservations not material to be now considered. Any patent of the United States which may hereafter be issued to the city from the land department at Washington can neither add to nor take from the title already vested in the city and those claiming under it. The confirmation approved and affirmed by the act of congress will control any patent which the department may issue. A patent of the United States operates, as was held by the supreme court in a recent case, in two ways: "It is a conveyance by the government," said the court, "when the government has any interest to convey, but where it is issued upon the confirmation of a claim of a previously existing title, it is documentary evidence having the dignity of a record of the existence of that title, or of such equities respecting the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing rights, because it also embodies words of release or transfer from the government." Langdeau v. Hanes, 21 Wall. [88 U. S.] 521. It was a legislative confirmation of which the court was here speaking, and in the case of San Francisco, we have both a judicial and a legislative confirmation, the latter sanctioning and affirming the former. By them the title of the city and her alienees became perfect, and no patent can ever disturb or strengthen it. And yet a patent will be of great value, as it will enable parties to maintain their titles in the tribunals of the country without other proof of the claim of the city and its confirmation, and will also remove doubts as to the boundaries of the tract where their establishment rests in the uncertain recollection of witnesses as to places which are fast becoming obliterated by the improvements of a constantly increasing population. But it cannot by any possibility make a creek running into the bay a part of the bay itself, and it is not to be supposed that any suggestion of the kind will be heard with favor by those to whom the duty of issuing a patent is entrusted.

NOTE. The decision in the above case was given orally, the presiding justice stating at length his views, and observing that he would at a subsequent day file an opinion embodying their substance. A day was then fixed for counsel to prepare the findings, but soon afterwards the case was settled, and the suit dismissed by stipulation of parties.

TRISTRAM SHANDY, The (HAINEY v.). See Case No. 5.906.

TRITCH (HALLACK v.). See Case No. 5,956.