Edwin O. Rood and Chas. W. Rood, Appellees, v. Geo.
A. Wallace, Emily J. Wallace, Geo. S. Wal-
lace and Mrs. Geo. S. Wallace, Appellees, State of
Iowa, Intervener, Appellant, Geo. R. Parsons, Appel-
lee, v. A. F. Johnson and Mrs. A. F. Johnson, Appel-
lees, State of Iowa, Intervener, Geo. R. Pearson,
Appellee, v. Geo. A. Wallace and Emily J. Wallace,
Apellees, State of Iowa, Intervener, Appellant, Ed-
win O. Rood and Chas. W. Rood, Appellees, v. B. D.
Barrett and Malinda Barrett, Appellees, State of
Iowa, Intervener, Appellant, and Edwin O. Rood and
. Chas. W. Rood, Appellees, v. James O'Connell and
Mrs. James O'Connell, Appellees, State of Iowa,
Intervener, Appellant.

**Title to Public Lands.** The United States Government never had
control or ownership of the lake beds in the state, the title thereto
being vested in the state.

Authority of governor. Under Acts Fifth General Assembly,
chapter 138, section 3, which authorizes the Governor to secure
title to the state to swamp lands, he may request the United
States land commissioner to issue a patent of swamp lands to the
state.

**Government Survey:** conclusiveness. A United States survey, fixing
land covered with water as being a lake, followed by a sale of
adjacent land with reference to the survey, is not conclusive,
precluding the land department from determining that the land is
a swamp, if the purchasers of the adjacent land are not prejudiced.

Same. The Governor may submit to the United States land depart-
ment a question whether certain land in the state is swamp land,
where there is a fair dispute as to its character, in view of Acts
Fifth General Assembly, chapter 138, section 3, authorizing him to
secure title to the state to the swamp lands.

Collateral attack. A decision of the United States land depart-
ment on a fair dispute, that certain land is swamp land, within
Act of Congress, September 28, 1850, known as the "Swamp Land
Grant," is conclusive when collaterally assailed.

**Quieting Title:** possession: *Intervention.* In an action to quiet
·title to land in plaintiff's possession, a petition of intervention·by

4   the state asking relief against plaintiff should be dismissed if the state has no title, though plaintiff fails to show title, as plaintiff's possession is a sufficient defense against the petition of intervention.

*Appeal from Humboldt District Court.*—HON. LOT THOMAS, Judge.

FRIDAY, MAY 26, 1899.

THESE are controversies over about eight hundred acres of land lying in Humboldt county, Iowa, which was meandered by the original government surveyors, and designated on the plat as "Owl Lake." Plaintiffs claim title under act of congress of September 28, 1850, commonly known as the "Swamp-Land Grant." Defendants claim that the lands were unsurveyed lands, belonging to the national government, and subject to entry under the homestead and pre-emption laws, and that they entered upon and are in possession of the property for the purpose of making such entry. The state of Iowa intervened in each suit, and claims that it owns the land in virtue of its right of sovereignty over and title to the bed of all lakes meandered by the general government. The trial court quieted the title in plaintiff, and the state appeals.—*Affirmed.*

*Milton Remley,* Attorney General, and *W. L. Smith* for the State.

*R. M. Wright, Bolsford, Healy & Healy,* and *M. D. O'Connell* for Plaintiff Appellees.

*S. W. White, J. E. Mershon,* and *Prouty, Coyle & Prouty* for Defendant Appellees.

DEEMER, J.—The township in which the land in controversy is situated was surveyed and platted by the general government in the fall of the year 1851. What was denominated upon the plat as "Owl Lake" was mean-

dered, and the land adjacent thereto was subdivided into
regular and irregular tracts.  Some of the lots were desig-
nated as "swamp lands," and all of the tracts surveyed were
sold to various parties many years before this litigation
began.·  At some places this lake had well-defined banks
and shore lines, and at other places it had no banks, but
diverged into a slough or low, wet lands.  It had some clear
water, but, as a general rule, was filled with rank weeds,
water lilies, and rushes.  In the year 1884 plaintiffs dug
a ditch, which drained off much of the water, and in 1894
this ditch was deepened and widened, with the result that
the land is now almost wholly fit for cultivation.  In Jan-
uary of the year 1879 the county conveyed all of its remain-
ing swamp lands to the Ft. Dodge & Ft. Ridgley Railroad
Company.  In 1895, plaintiffs, having previously obtained
a title or claim of title to the land through certain mesne
conveyances from Humboldt county, and having drained
the same, applied to the then governor to request the land
commissioner of the United States land office to issue a
patent for the land in controversy to the state under the act
of congress hitherto mentioned.  The request was made and
granted, and a patent was issued to the state.  The governor
thereupon issued a patent to the county under date of April
·30, 1895.  Humboldt county was not organized until Jan-
uary 15, 1857.  The character of the so-called "lake" is a
matter of much dispute.  Some of the witnesses describe
it as a shallow lake, while others say that it was marsh or
swamp land.  The state makes the following contentions
regarding the ownership of the land: (1) That the lake beds
of all-meandered lakes and streams in the state belong to
the state of Iowa, in trust'for the public, by virtue of its
sovereignty, and this right does not depend upon any act
of congress or grant from the United States.  (2) That the
survey of the public lands of the United States, the approval
of such survey by the land commissioner of the United
States and the secretary of the interior, and a sale of the

lands under such survey, fixes the status of the meandered lakes and streams, except in cases of palpable mistake or fraud, beyond recall by any subsequent act of the land department. (3) That the land commissioner of the United States had no authority, by act of congress or under the constitution, to patent to the state of Iowa any lake beds which had been meandered, and were already the property of the state. (4) That the governor of the state of Iowa was unauthorized by any law to request the land commissioner of the United States to issue a patent for the land in controversy, and hence the two patents, first from the United States to the state of Iowa and second from the state of Iowa to Humboldt county, were wholly void.

We are quite ready to assume, as a general proposition, that title to all the lake beds in the state, especially those of navigable lakes, is in the state; and that the general government never had any control or ownership thereof. Indeed, this seems to be the almost unbroken voice of authority. *Pollard's Lessee v. Hagan,* 3 How. 212; *Withers v. Buckley,* 20 How. 92; *Shively v. Bowlby,* 152 U. S. 1 (14 Sup. Ct. Rep. 548); *Mann v. Land Co.,* 153 U. S. 273 (14 Sup. Ct. Rep. 820); *Knight v. Association,* 142 U. S. 161 (12 Sup. Ct. Rep. 258); *Illinois Cent. R. Co. v. Illinois,* 146 U. S. 387 (13 Sup. Ct. Rep. 110); *Gunter v. Geary,* 1 Cal. 463; *Hinman v. Warren,* 6 Or. 408; *Haight v. City of Keokuk,* 4 Iowa, 199; *Hardin v. Jordan,* 140 U. S. 271 (11 Sup. Ct. Rep. 808, 838); *Veazie v. Moor,* 14 How. 568; *Noyes v. Collins,* 92 Iowa, 566; *Lamprey v. Metcalf,* 52 Minn. 181 (53 N. W. Rep. 1139). But, when, how, and by whom is the question of whether the land is a lake bed to be determined. The attorney general contends that this is done at the time the original survey is made, by the approval of the survey, and the sale of the lands with reference thereto. At the time the original survey was made, the following was one of the rules promulgated for

instruction of surveyors: "You are also to meander, in manner aforesaid, all lakes and deep ponds of the area of 25 acres and upwards; also navigable bayous. Shallow ponds readily drained or likely to dry up are not to be meandered." Lester Land Laws (ed. 1860) p. 714. And while the instructions require a plat of the township to be made designating swamp lands, streams, etc., and that the plats for the township be approved by the surveyor general, the commissioner of the land office, and, in case of controversy, by the secretary of the interior, yet prior to April 17, 1879, it was not the practice of the land department to require any specific approval by the commissioner of either the surveys or the plats. *Tubbs v. Wilhoit,* 138 U. S. 142 (11 Sup. Ct. Rep. 279). Moreover, the requirement as to approval was simply a rule of the department, which might be waived. It did not have statutory sanction. But suppose that the surveyor general and the land commissioner did approve the plat of the original survey, is this conclusive upon the parties? That question seems to be answered by our own cases. See *Grant v. Hemphill,* 92 Iowa, 218; *Bigelow v. Hoover,* 85 Iowa, 161; *Glenn v. Jeffrey,* 75 Iowa, 20. In these cases the original survey was not given the force of an adjudication, but the fact as to the character of the land was determined by evidence aliunde. The attorney general frankly concedes that the general government may have a resurvey in case of fraud, palpable mistake, or for some other causes, but he contends no such resurvey can be made after the first survey has been approved, and lots sold with reference thereto. No doubt this is a general rule, but who may complain of this resurvey? Surely not the state; for, if the general government has power to order a resurvey because of mistake, it also has power to determine whether there has been a mistake. Purchasers of lots abutting on the meandered line, or otherwise directly interested, are, it seems to us, the only persons who may object to the resurvey; and no resurvey will be permitted which will in any man-

ner prejudice their interests. They, as we have seen, are not made parties to this suit, and are making no objection to plaintiff's title. The case of *Moore v. Bobbins,* 96 U. S. 530, and other like cases, relied on by appellant, relate to the power of the general government over lands to which it has issued a patent; and it is there held that the functions of the executive department cease when the title has passed from the general government. As to the power and right of the secretary of the interior to set aside a survey, or to order unsurveyed lands surveyed, see *Knight v. Association,* 142 U. S. 161 ( 12 Sup. Ct. Rep. 258); *Cragin v. Powell,* 128 U. S. 691 (9 Sup. Ct. Rep. 203); *Railroad Co. v. Butler,* 159 U. S. 87 (15 Sup. Ct. Rep. 991. In the first case it is said: "It is a well-settled rule of law that the power to make and correct surveys of the public lands belongs exclusively to the political department of the government, and that the action of the department, within the scope of its authority, is unassailable in the courts except by a direct proceeding. *Cragin v. Powell,* 128 U. S. 691, 699 (9 Sup. Ct. Rep. 203), and cases cited. Under this rule it must be held that the action of the land department in determining that the Von Leicht survey correctly delineated the boundaries of the pueblo grant, as established by the confirmatory decree, is binding in this court if the department had jurisdiction and power to order that survey. It is claimed, however, and the referee so determined, that no such power or authority existed in the department, because it had been exhausted by the action of the commissioner of the general land office in approving and confirming the Stratton survey in 1878. This contention is based upon the proposition that the secretary of the interior had no authority to set aside the order of the commissioner approving and confirming the Stratton survey, especially in view of the fact that no appeal was taken from such order and the authorities of the city acquiesced in that survey. This proposition is unsound. We conclude on this branch of the case that the secretary of the interior had

ample power to set aside the Stratton survey, and order a new survey by Von Leicht, and that his action in such matter is unassailable in the courts in a collateral proceeding. The Von Leicht survey, therefore, must be held as a correct survey of the pueblo claim as confirmed by the circuit court. Moreover, the method of running the shore line of the bay of San Francisco, adopted by the Von Leicht survey, was approved by the circuit court itself in *Tripp v. Spring,* 5 Sawy. 209, Fed. Cas. No. 14,180, and on this point we entertain no doubt." There seems to be no doubt that the secretary of the interior had the right, in so far as the parties to this suit are concerned, to redetermine the question as to whether or not the land in question was a part of the lake bed, or was covered by the so-called "Swamp-Land Act." And this brings us to the next question: What force is to be given the determination of the land commissioner that the land was in fact swamp land, and what effect is to be given the patent issued to the state? That question seems to be answered by *Rogers Locomotive Mach. Works v. American Imigrant Co.,* 164 U. S. 559 (17 Sup. Ct. Rep. 188). In that case it is held that a decision of the secretary of the interior to the effect that certain lands did not pass as swamp lands under the act of 1850, and the acceptance and transfer of them by the state, was conclusive upon one who claimed title under the swamp-land act. Again in *French v. Fyan,* 93 U. S. 169, that court said that: "By the second section of the swamp-land act the power and duty devolved upon the secretary of the interior, as the head of the department which administered the affairs of public lands, of determining what lands were of the description granted by that act, and made his office the tribunal whose decision on that subject was to be controlling." See, also, as sustaining the same conclusion, *Chandler v. Mining Co.,* 149 U. S., 79 (13 Sup. Ct. Rep. 798); *McCormick v. Hayes,* 159 U. S. 332 (16 Sup. Ct. Rep. 37). In *Steel v. Refining Co.,* 106 U. S. 477 (1 Sup. Ct. Rep. 389), we find this language:

"That department, as we have repeatedly said, was estab-
lished to supervise the various proceedings whereby a con-
veyance'.of title from the United States to portions of the
public domain is obtained, and to see that the requirements
of the different acts of congress are fully complied with.
Necessarily, therefore, it must consider and pass upon the
qualifications of the applicant, and the acts he is to per-
form to secure title, the nature of the land, and whether it
is of the class open to sale. Its judgment upon these mat-
ters is that of a special tribunal, and is unassailable, except
by direct proceedings for its annulment or limitation." As
the land department determined the lands in controversy
to be swamp, and issued its patent to the state accordingly,
that determination is conclusive, and the patent cannot be
collaterally attacked. *Steel v. Refining Co., supra; Wright
v. Roseberry,* 121 U. S. 488 (7 Sup. Ct. Rep. 985); *Minter
v. Crommelin,* 18 How. 87.

The state further claims that plaintiffs have not made
out their chain of title, in this: that they have not shown
that the conveyance from the county to the Ft. Dodge Rail-
road Company was ratified by vote of the people. It
may be that the evidence on this point is insufficient, but the
record does show that plaintiffs are in possession of the land
under claim of title. The state intervened, and asked
relief against them. As they are in possession, and
were at the time this suit was commenced, the inter-
vener must recover on the strength of its own title, and not
on the weakness of that of its adversary. If the state has no
title, its petition of intervention should be dismissed, without
regard to the title under which the plaintiffs claim. Their
possession is a sufficient defense to the petition of interven-
tion, for the state cannot rely upon title in a third person to
defeat plaintiff's recovery.

Lastly, it is said that the governor of the state had no
authority to request the land commissioner to issue a patent

for the land in controversy, and that the patent to the state and from the state to the county are void. His authority in the premises is conferred by act of the general assembly passed January 25, 1855, which reads as follows: "The governor is hereby authorized to adopt such measures as to him may seem expedient to provide for the selection of the swamp lands of this state, and to secure to the state the title to the same, and also for the selection in the name of the state of other lands in lieu of such swamp lands as may have been or may hereafter be entered with warrants." See Acts Fifth General Assembly, chapter 138, section 3. Whenever question arose as to the character of land such as that in dispute, it was certainly competent for the governor to submit the matter to the only authority that had original jurisdiction in the matter; and, having so submitted it, that decision is final. If there was no real dispute as to the character of the land,—if, for instance, the property was a part of the bed of any of the navigable rivers of this state, or if it was property which was clearly lake bottom,—it may be that the governor would not be justified in submitting the matter as to its character to the land department; and if he did so, and the land department found that the land was swamp when surveyed, such conclusion would be null and of no effect. But when there is a fair dispute as to the character of the land when originally surveyed, surely the land department has the right to determine the dispute; and, as a general rule, its decision is binding until set aside by direct attack. The whole case, in our judgment, turns upon the effect to be given the original survey. If that is conclusive, it amounts to a segregation of the lakes and river beds from the public domain, and, as a general rule, confirms the title thereto in the state. If the survey is not conclusive, but is simply administrative or advisory, then the land department has the right at some future day to determine its character, and cause a patent to issue accordingly. And when this is done

the finding is not subject to collateral attack. As has been said, we do not regard the original survey conclusive. There may be a resurvey, or an independent investigation as to the character of the land, and, as a special tribunal is provided for that investigation, its determination is ordinarily conclusive. It follows from what has been said that the decree of the district court is correct, and it is AFFIRMED.