STATE OF IOWA v. J. N. JONES, FRANK MONTGOMERY, and the MARSHALL DENTAL MANUFACTURING COMPANY, Appellants.

**Public Lands:** SWAMP: TITLE. The legal title to swamp lands remains in the government until patent therefor has been issued, conveying it to the state.

**Same:** NON-NAVIGABLE LAKES. To constitute a non-navigable lake no particular depth of water, or that it cover the entire bed at all seasons, is essential; it is sufficient if there are well-defined

banks, filled during a 'portion of the year; and where a body of water is one to be meandered according to the rules of the Interior Department, and upon an application for a survey of its bed it has been decided by the department not to be public land and to have been properly surveyed, it should be regarded as a non-navigable lake.

**Same:** MEANDERED LAKES: EXTENT OF RIPARIAN OWNER RIGHTS. The owner of land in this state bordering upon a non-navigable lake which has been meandered by the government survey, takes title simply to the waters edge and not to the center of the lake.

**Meandered lakes:** TITLE: DRAINAGE: INJUNCTION BY STATE. The title to the bed of non-navigable, meandered lakes, is not affected by a conveyance of the shore lands merely, but remains, unless otherwise disposed of, in the general government for the benefit of all the people alike; but the government having treated them as under the control and sovereignty of the state, for the use and benefit of the public, the state has thus acquired such an interest therein, as will support an action by it to restrain those who are without title from draining the waters therefrom, or otherwise exercising proprietary control over the same.

*Appeal from Greene District Court.*—HON. Z. A. CHURCH, Judge.

FRIDAY, JULY 2, 1909.

ACTION to enjoin the defendants from draining water from Goose Lake resulted in a decree as prayed. The defendants appeal.—*Affirmed.*

*E. B. Evans* and *C. L. Nourse,* for appellants.

*H. W. Byers,* Attorney General, and *George Cosson,* Assistant Attorney General, for the State.

LADD, J.—Goose Lake is that portion of sections 1 and 12 in township 84, and of section 36 in township 85 N., of range No. 31 W. of the fifth P. M., and of sections 6 and 7 in township 84 of range 30 W. of the fifth P. M., meandered by the government survey of 1853. It is sev-

eral hundred acres in extent, and, as the evidence shows, has a well-defined bank or rim. The water is and always has been shallow, varying in depth with the falling of rain and the melting of snows. It is surrounded by high lands which drain into it, and has no outlet save a swale through which the water flows out when the bed fills. Much of the time a large portion of the bed is overgrown with rushes, water lilies, and other vegetation, so that not more than one-fifth of the water in it is clear. In 1907, when the surveyor employed by defendants surveyed it, he found much of the bed so dry that he excavated at several places, finding the vegetable mould on the bottom from twenty to thirty inches deep, underlaid with one to six inches of sand, with clay below. The surveyor employed by the plaintiff thought much of the bed covered with water when he examined it during the same year. The evidence indicates that during the dry portions of the season the water in the lake is from eight inches to five or six feet deep, and grass covers much of the bed, and that when the bed fills so as to overflow it is from three or four to eleven to sixteen feet deep. Boats and skiffs have been kept on the lake for hunting and fishing purposes since the early days of settlement. It can not be said with any degree of accuracy from the photographs from how much of the bed the water recedes, but the condition of vegetation on the bottom indicates much of it becomes dry during the dry season.

The Marshall Dental Manufacturing Company obtained a conveyance of the lake bed in controversy through several mesne conveyances from the American Immigrant Company, to whom Greene County had conveyed all the swamp lands within its borders, but no patent has ever issued from the United States to the state therefor, and for this reason the legal title thereto, if a part of the swamp lands, remains in the general government. *Young v. Charnquist,* 114 Iowa, 116; *Ogden v. Buckley,* 116 Iowa, 352.

1. PUBLIC LANDS: swamps: title.

An application was made by this company to the
General Land Office in 1903 for the survey of the lake
bed, and the Secretary of the Interior, in a careful opinion
reviewing the evidence, including the field
notes of the government survey, found that
insufficient proof had been submitted to im-
peach the correctness of the survey by which Goose Lake
was meandered, "thereby determining, so far as lies in the
power of the department, that the lands in controversy are
not public lands." This was put upon the ground that
"the department has power to correct surveys upon a proper
showing, but, as has been frequently said, the proper rule
is to refuse to disturb the public surveys except on the
clearest proof of accident, fraud, or mistake, where a re-
survey may affect the rights or claims of any one resting
upon the original survey." The Secretary pointed out that,
inasmuch as the department declined to do anything, a
remedy in the courts might be open to the applicant, under
the doctrine of *Railroad Co. v. Smith,* 9 Wall. 95 (19 L.
Ed. 599), as construed in *French v. Fyan,* 93 U. S. 169
(23 L. Ed. 812), and observed that "the title to the beds
of all lakes that were properly meandered vest in the state
by virtue of its sovereignty, and no reason can be per-
ceived why the state can not assume control of this land and
reclaim it by drainage or make any other disposition it
may see proper, in view of this decision holding that the
lake bed is not public land left unsurveyed." In view of
this decision by the department of the government em-
powered to pass upon the question, as has been held in
numerous cases, we are not prepared to say that this lake
bed passed under the terms of what is known as the "Swamp
Act" of Congress (Act Sept. 28, 1850, c. 84, 9 Stat. 519).
One of the rules promulgated by the department for the
guidance of surveyors is the following: "You are also to
meander, in the manner aforesaid, all lakes and deep ponds
of the area of twenty-five acres and upwards; also navigable

2. SAME: non-
   navigable
   lakes.

bayous; shallow ponds readily drained or likely to dry are not to be a meander." Surely this lake comes within the description of bodies of water to be meandered, and, in view of the decision of the Secretary of the Interior, it should be regarded a nonnavigable lake. To constitute such a lake, no particular depth of water is essential, nor is it necessary that the water cover the entire bed at all seasons of the year. It is at least enough if the body of water has well-defined banks which are filled during portions of the year. It is apparent that the company has no legal title, although it was proceeding at the time the injunction was sued out to drain the waters from this lake by the excavation of ditches and the laying of tile. The mere fact, however, that it had no title, will not alone justify restraining defendants from making this improvement. Unless the state has title to or control over the bed of the lake or the water covering it, it may not interfere.

The law is settled in this state that the owner of land bordering on a non-navigable body of water meandered by government surveyors has title to the water's edge, and not to the center of the lake, as is held in some states. *Wright v. Council Bluffs,* 130 Iowa, 274; *State v. Thompson,* 134 Iowa, 25. And the Supreme Court of the United States has laid down the rule that this question is peculiarly for the decision of the respective states. *Hardin v. Jordan,* 140 U. S. 371 (11 Sup. Ct. 808, 35 L. Ed. 428). In many states the riparian owner is held to take title in the bed of the lake to its center, and such appears to have been the rule at common law. See *Hardin v. Jordan, supra; Bristow v. Cormican,* L. R. 3 App. Cas. 641; *Cobb v. Davenport,* 32 N. J. Law, 369; *Shell v. Matteson,* 81 Minn. 38 (83 N. W. 491); *Clute v. Fisher,* 65 Mich. 48 (31 N. W. 614); *Hodges v. Williams,* 95 N. C. 331 (59 Am. Rep. 242); *Webster v. Harris,* 111 Tenn. 668 (69 S. W. 782,

3. SAME:
meandered
lakes: extent
of riparian
owner rights.

59 L. R. A. 324); *Poynter v. Chipman,* 8 Utah, 442 (32 Pac. 690).

The rule in this state, as will appear from the decisions, is well supported by authority, and the inquiry arises, What becomes of the title to the bed of the lake when the riparian owner takes to the water's edge only?

4. MEANDERED LAKES: title: drainage: injunction by state.

Is it retained by the United States, or does it pass to the state in which the body of water is located? This question has been raised in this court several times, but never determined. In *Rood v. Wallace,* 109 Iowa, 5, a readiness to assume title to be in the state was expressed, and this was assumed in *State v. Thompson,* 134 Iowa, 25. In *Carr v. Moore,* 119 Iowa, 152, in stating that riparian owners take to high-water mark only, the court added, "the title being in the state." But this was mere *dictum,* and the suggestion in *State v. Thompson* that "the state became the owner of all lands forming the bed of the inland lakes within its borders which had been meandered by government survey and excluded from public lands as was the lake in question" was of a proposition not controverted, and not the finding of the court. If title is within the state, when and how was it acquired? Under the treaty of 1803 (Act April 30, 1803, 8 Stat. 200), with the French Republic, through which the Louisiana territory, out of which this state was carved, was acquired, all vacant lands, not privately owned, were expressly ceded to the United States. These had been obtained by France from Spain under treaty of three years previous. The act of Congress approved March 3, 1845, for the admission of Iowa as a state, provided that "it shall never interfere with the primary disposal of the public lands lying within its borders." Act March 3, 1845, chapter 48, section 7, 5 Stat. 743. And this condition was accepted by the state in an act of the General Assembly dated January 15, 1849, to the effect that it would not "interfere with the primary disposal of the soil within the same by the

United States nor with any regulations Congress may find necessary for securing the title in such soil to *bona fide* purchasers thereof." Laws 1848-49, chapter 91. The title to said lands in the United States became perfect and complete as to any others of the public domain. 1 Kent, Com. 257.

As remarked in *Irvine v. Marshall*, 20 How. 558 (15 L. Ed. 994) : "It can not be denied that all the lands in the territories, not appropriated by competent authority before they were acquired, are in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, and in such modes and by such titles as the government may deem most advantageous to the public or in other respects most politic." And the word "lands" includes the beds of non-navigable lakes and streams. "Lands are not the less land for being covered with water." *Queen v. Leeds & L. Canal Co.*, 7 Ad. & El. 671, 685; *Illinois Cen. Ry. Co. v. Chicago*, 176 U. S. 646 (20 Sup. Ct. 509, 44 L. Ed. 622); *Hardin v. Jordan*, 140 U. S. 371 (11 Sup. Ct. 808, 35 L. Ed. 428).

Prior to the admission of Iowa as a state the title to this lake bed was in the United States, and it was not thereby divested. Navigable waters in the territories are held as highways of travel and commerce by the government, but with the soil beneath them pass to the new states upon their admission to the Union in virtue of their sovereignty, subject to the regulation of commerce by Congress. *Barney v. Keokuk*, 94 U. S. 324 (24 L. Ed. 224).

In *Illinois C. R. Co. v. Illinois*, 146 U. S. 387, 425 (13 Sup. Ct. 110, 36 L. Ed. 1018, 1036), the court, speaking through Mr. Justice Field, said: "It is the settled law of this country that the ownership of, and dominion and sovereignty over, lands covered by tide waters, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done

without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states. This doctrine has been often announced by this court, and is not questioned by counsel of any of the parties. *Pollard v. Hagan,* 3 How. 212 (11 L. Ed. 565); *Weber v. State Harbor Com'rs,* 18 Wall. 57 (21 L. Ed. 798). The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes, over which is conducted an extended commerce with different states and foreign nations. These lakes possess all the general characteristics of open seas, except in the freshness of their waters, and in the absence of the ebb and flow of the tide. In other respects they are inland seas, and there is no reason or principle for the assertion of dominion and sovereignty over and ownership by the state of lands covered by tide waters that is not equally applicable to its ownership of and dominion and sovereignty over lands covered by the fresh waters of these lakes." Manifestly non-navigable waters are not within this doctrine, and upon what theory it may be said that title to the beds of non-navigable lakes pass from the government to the state upon its admission to the Union, courts so holding have not taken the trouble to explain.

The whole subject was exhaustively examined by Mr. Justice White in the dissenting opinion filed in *Kean v. Calumet Canal & Imp. Co.,* 190 U. S. 452 (23 Sup. Ct. 651, 47 L. Ed. 1134). See, also, that in *Hardin v. Shedd,* 190 U. S. 508 (23 Sup. Ct. 685, 47 L. Ed. 1156). Nothing in the majority opinions in these decisions conflicts with the view that title remains in the government, but these proceed apparently on the theory that the matter is purely one to be determined by local rules of conveyancing. In the last case, the court, speaking through Mr. Justice Holmes, said: "When land is conveyed by the United

States bounded on a non-navigable lake belonging to it, the grounds for the decision must be quite different from the considerations affecting a conveyance of land bounded on navigable water. In the latter case, the land under the water does not belong to the United States, but has passed to the state by its admission to the Union. Nevertheless, it has become established almost without argument that in the former case, as in the latter, the effect of the grant on the title to adjoining submerged land will be determined by the law of the state where the land lies. In the case of land bounded on a non-navigable lake, the United States assumes the position of a private owner subject to the general law of the state, so far as its conveyances are concerned. When land under navigable water passes to the riparian proprietor along with the grant of the shore by the United States, it does not pass by force of the grant alone, because the United States does not own it, but it passes by force of the declaration of the state, which does own it, that it is attached to the shore. The rule as to conveyances bounded on non-navigable lakes does not mean that the land under such water also passed to the state on its admission or otherwise, apart from the swamp land act, but is simply a convenient, possibly the most convenient, way of determining the effect of a grant. We are particular in calling attention to this difference, because we fear that there has been some misapprehension with regard to the point." There seems no ground for saying that the state acquired title to the non-navigable lakes upon admission of the state to the Union. But as seen in the matters of conveyancing, the government, with respect to lands bounded on them, assumes the position of a private owner. Recognizing the public utility of such waters for the purposes of fishing, boating, hunting, and the like, uplands have not been surveyed, platted or sold by the government beyond the high-water mark. The waters and the soil beneath have been withheld from private appropriation by the government for

the benefit of all the people. And, since the earliest settlements, the people have continued unmolested in the enjoyment of the benefaction. The policy of the state in stocking these small bodies of water with game fish, and their protection by law, has obtained for many years. These lakes afford means of recreation. They supply food of inestimable value. The conclusion is unavoidable that the government, in reserving the numerous small lakes of the state from sale, intended them for the public use. No attention has been bestowed thereon since by the government, and in all respects, save in the regulation of commerce, non-navigable lakes like those which are navigable, have been treated as under the control and sovereignty of the state. Effect to patents of the shore lands as to the beds of lakes of either character, according to the construction of state courts, has been given by the federal courts. The only tenable ground for these decisions is that the state, either as owner of the beds or entitled to control the beds and the waters in them, should determine whether these or parts of them shall pass under conveyance of the shore lands. That the reservation of non-navigable meandered lakes by the United States has been for the state in trust for all the people seems to have been the opinion of the courts of Wisconsin and Illinois. The Supreme Court of Wisconsin so declared in *Nee-Pee-Nank Club v. Wilson*, 96 Wis. 290 (71 N. W. 661), saying that the soil under the lake "is owned by the state. The right of fishing and fowling upon such waters is in the owner of the soil which is under the water." See *Mendota Club v. Anderson*, 101 Wis. 479 (78 N. W. 185). In *Hammond v. Shepard*, 186 Ill. 235 (57 N. E. 867, 78 Am. St. Rep. 274) the court remarked: "The law of this state, as repeatedly announced, is that the shore owner on meandered lakes, whether navigable or non-navigable, takes title only to the water's edge, the bed of the lake being in the state." In *Schulte v. Warren*, 218 Ill. 108 (75 N. E. 783, 13 L. R. A. (N. S.) 745),

it is said: "The ownership of. the bed of the lake is in
the state in trust for all the people for the purpose of
fishing, boating, and the like." And in *Fuller v. Shedd,*
161 Ill. 462 (44 N. E. 286, 33 L. R. A. 146, 52 Am. St.
Rep. 380), the court, speaking through Phillips, J., said:
"The policy of the state, of recent years has been to stock
its water, both streams and lakes, with fish, as a means of
giving cheap and valuable food to our citizens, and, with
this purpose, regular appropriations and expenditures are
made. If we depart from the reasonable rule we have es-
tablished, the smaller non-navigable lakes would become the
private waters of riparian owners, pertinent to their lands,
with exclusive rights thereon as to boating, fishing, and
the like, from which the body of the people would be ex-
cluded, a principle inconsistent with and not suited to the
condition of our people, nor called for as a rule of law.
. . . We are asked to overrule the latter case (*Trustee
v. Schroll,* 120 Ill. 509, 12 N. E. 243, 60 Am. Rep. 575)
and hold that the grant to the riparian owner conveys the
bed of a non-navigable lake and makes its waters mere
private water. We decline to do so. By such holding, so
long as such meandered lakes exist, over their waters and
bed, when covered with water, the state exercises control,
and holds the same in trust for all the people, who alike
have benefit thereof in fishing, boating, and the like. By
the adoption of. this principle, which applies alike to all
meandered lakes, streams, and rivers, there is no conflict
with that applying to the sea; and literal proprietors and
riparian owners alike have all the benefits and rights of
such ownership, and take accretions to their lands." This
case again appears as *Hardin v. Shedd,* 177 Ill. 123 (52
N. E. 380), from which the appeal was taken to the Su-
preme Court of the United States. Like decisions are to
be found in Massachusetts and Maine, but as these are based
on an ordinance of the former, enacted in 1647, which
made every lake. of more than ten acres in extent public,

they are not pertinent. *West Roxbury v. Stoddard*, 7 Allen (Mass.) 158; *Bradley v. Rice*, 13 Me. 198 (29 Am. Dec. 501).

We are not now concerned with the inquiry as to whether the state may dispose of these lake beds in a manner inimicalable to the purposes of their reservation by the general government. It is enough to dispose of the case at bar to decide, as we do, that the state has such an interest in Goose Lake as will support an action to restrain defendants, who are without title, from draining the waters therefrom, or otherwise exercising proprietary control over the same.

The decree of the trial court is *affirmed.*