FLISRAND, Appellant, v. MADSON et al., Respondents.

(152 N. W. 796.)

(File No 3615.  Opinion filed May 17, 1915.  Rehearing denied July 24, 1915.)

**1.  Waters and Water Courses—Riparian Rights—Island in Lake— "Reliction."**

An island, of about 25 acres of land, situated about 18 rods from the outer shore of a meandered lake, which island had never been entirely covered by the water, but was entirely surrounded by water, except in times of extreme low-water, when there was no· water between it and the meander line of a lot fronting on the lake, the whole of which island, except a small part of one end thereof, situated most remotely from the shore, was embraced in what was known as "relicted lot No. 21," the shore line of which lot 21 was co-extensive with a congressional lot owned by plaintiff and bounded in part by said meander line, was not "relicted" land, and plaintiff never had any title to or interest in any part of said alleged relicted lot, within the boundaries of the lake bed below the low-water mark, except only as a purely riparian right appertaining to his meandered lots or parcels of land bordering on the lake; reliction being land added to a tract fronting upon the waters of a lake, pond, or stream, by the permanent covering of land, or the laying bare of the bottom by the permanent retirement of the waters; the temporary subsidence of the waters occasioned by the seasons, or by periods of drought, not constituting reliction in the sense of an addition to the contiguous land; it being a permanent change which takes place by gradual and imperceptible degrees, and there being no reliction where the water periodically rises over land and then recedes; those phases of the recission of the water, or the manner thereof, not being material, however, where the adjoining proprietor owns title to the bed of the lake.

**2.  Waters and Water Courses—Riparian Ownership—Title to Lake Bed Below Low-Water Mark—Effect of Government Meandering of Lake—Question, How Determined?**

The fact alone that a lake was meandered by government sur-

vey does not directly control in determining title of a riparian owner to lands under a lake between low-water mark and the .center of the lake, as a meander line is not considered a boundary line, but merely serves to define the sinuosities of the bank of the lake, and as a mode of ascertaining the amount of land in the fractional tract subject to sale, and which is to be paid for by the purchaser; and the determination of these questions depends upon the character of the lake.

2. **Waters and Water Courses—Navigable Waters—Ownership of Lake Bed—"Navigable Lake"—Ebb and Flow of Tide, Nonapplicability of that Rule.**

Under Civ. Code, Sec. 192, making ownership of land below ordinary high-water mark, and of land below water of a navigable lake or stream, regulative by federal or state laws, and making the state owner of all property lawfully appropriated to its own use and all property of which there is no other owner, and Sec. 289, providing that, except where the grant indicates a different intent, the owner of the land bordering on a navigable lake or stream takes title to the edge of the water at low-water mark, and that all navigable rivers shall remain public highways, and that, where opposite banks of non-navigable streams belong to different persons, the stream and the bed thereof shall be common to both, held, that a natural inland meandered lake with an irregular boundary, about 5 miles long and 2½ miles wide, which was from 1 to 10 feet deep, except in times of extended drought, when the water gradually receded, so as to allow portions of the lake bed to be cultivated, which lake contained an abundance of fish, and was generally resorted to by the public for purposes of boating, fishing, hunting, and trapping, was a "navigable lake," and such water constituted public water, and the state was the owner of the bed of the lake, not as proprietary owner, in the sense that it might sell or otherwise dispose of the same for private ends, but as trustee for the benefit of the public; that the common law test of navigability, as indicated by the ebb and flow of the tide, has no application to our natural inland lakes, the question of whether or not waters are navigable depending on the natural availability of the waters for public purposes.

4. **Waters and Water Courses—Navigable Lake Waters—Ownership of Bed—"High-water Mark"—"Low-water Mark."**

Riparian owners have title to the edge of navigable lake waters at low-water mark, but in this respect high and low-water marks mean the high and low points of variation of the waters under ordinary conditions, unaffected by extreme and continuous freshets, or periods of extreme and continuous drought, and not the highest or lowest point reached by the waters during such periods.

5. **Waters and Water Courses—Ownership of Shore Between High and Low-water Mark—Qualified Title—Relative Rights of Owner and Public.**

The title of a riparian owner in navigable or public waters, to the shore space between high and low-water mark, is not absolute, but is qualified or limited by and subject to the rights of the public; and such owner has the right of access to an use of the water, the right to accretions or relictions which may attach to the shore, and the right to use the shore in all ways that he may desire, so long as, and with the exception that, he does not interfere with or prevent the public from also using or having access thereto for navigation, boating, fishing, fowling, and like public uses.

6. **Waters and Water Courses—Riparian Ownership—Bed of Non-navigable Lakes.**

Riparian shore owners have absolute ownership of the entire bed and shore of non-navigable or non-public ponds and lakes, or lakes which at some former time might have been public or navigable, but which by some natural cause have been permanently changed in character, so that the public could no longer reasonably claim to use them for public purposes.

7. **Quieting Title—Island in Lake—Issues—Irrelevancy of Plaintiff's Title by Possession—Failure of Defendants' Title by Prescription.**

In a suit to quiet title to an island in a lake to which plaintiff claimed title as a reliction, by virtue of his ownership of the shore line, held, that, it appearing that plaintiff had acquired no title to the island by reliction, it was immaterial whether defendant had acquired title by prescription.

8. **Public Lands—Non-meandered Island in Lake—Federal Treatment of Land as Part of Lake Bed, as Evidence of Abandonment of Title—Title of State.**

No survey, or note, by the United States, having been made of an island in an inland lake, at the time of the survey of the meander line around the lake, or at all, held, the United States, by having thus treated the island as part of the lake bed, abandoned its right to the island, and the title thereto was vested in the state, as part of the lake bed, under Civ. Code, Sec. 192.

Appeal from Circuit Court, Kingsbury County. Hon. ALVA E. TAYLOR, Judge.

Action by Ole N. Flisrand against M. Chris Madson and another, to quiet title and to determine conflicting rights to realty, being an island in an inland lake. From a judgment for defendants, and from an order denying a new trial, plaintiff appeals. Affirmed.

The alleged "relicted lot No. 21," title to which is in controversy, was surveyed by one claiming to be, but who, it was claimed, was not in fact, county surveyor, under instructions from plaintiff and others, as part of the general survey of the bed of the lake in question, which survey was ostensibly made pursuant to Laws 1903, Ch. 173, but such survey was not made within the time required by that act.

*Cheever & Cheever,* for Appellant.

*E. F. Green,* and *Ami N Whiting,* for Respondents.

(1) Under point one of the opinion, Appellant cited: Schlosser v. Crookshank, 65 N. W. 344( Iowa); Scheifert et al. v. Briegel et al., 96 N. W. 44; Chap. 173, Laws 1903; Shell v. Mattison, 83 N. W. 492 (Minn.); Butler v. Grand Rapids Ry. & Ir. Co., 48 N. W. 570; Hardin v. Jordan, 140 U. S. 439, 35 Law Ed.

(2) Under point two of the opinion, Appellant cited: Candos v. Mack, (Wis.) 46 N. W. 803; Fuller v. Dauphin, (Ill.) 16 N. E. 917; Inhabitants of Deerfield v. Arms, (Mass.) 28 Am. Dec. 276; Hardin v. Jordan, 140 U. S. 434; 17 Ency. 533, 535; 5 Cyc. 892; Lanphrey v. Metcalf, (Minn.) 53 N. W. 1139; Governeur et al. v. National Ice Co., 31 N. E. 865, (N. Y.); Hill ·r. Lord, 48 Maine, 83; Instructions of Department of Interior to Commissioner of General Land Office, 14 Land Dec. 119; Olson v. Huntamer et al., (S. D.) 61 N. W. 481.

Respondents cited: Ne-Pee-Pauk Club v. Wilson, (Wis.) 71 N. W. 661; Fuller v. Shedd, 161 Ill. 108, 33 L. R. A. 146; Hardin v. Jordan, 140 U. S. 371, 35 L. Ed. 428; Lamprey v. Metcalf, (Minn.) 53 N. W. 1139; State v. Jones, (Iowa) 122 N. W. 241; 40 Cyc. 636; 18 A. & E. Ency of Law, (2d Ed.) 132-134 and cases cited; 18 L. R. A. 681; 18 L. R. A. 695 and note; Bigelow v. Hoover, (Iowa) 52 N. W. 124; Noyes v. Collins, (Iowa) 61 N. W. 250, 26 L. R. A. 609; Fuller v. Shedd, (Ill.) 33 L. R. A. 146.

(8) Under point eight of the opinion, Appellant cited: 17 Ency. (2d Ed.) 535 and cases cited; 17 Ency 535; Fuller v. Dauphin, 16 N. E. 917 (Ill.); Butler v. Grand Rapids Ry. Co. et al., 48 N. W. 569 (Mich.)

McCOY, P. J. This is an action to quiet title and determine conflicting property rights, brought by plaintiff against defend-

ants. Plaintiff alleged that he was the owner of lot 1, in section 11, and lots 1, 2, and 3, and the S. E. ¼ of N. W. ¼, and the S. ½ of N. E. ¼ of section 14, and relicted lot 21, all in township 112, range 53, Kingsbury county, and prayed judgment quieting and confirming title thereto in himself. Defendants answered, admitting plaintiff to be the owner of lot 1, section 11, and lots 1, 2, and 3, and the S. E. ¼ of N. W. ¼, and the S. ½ of N. W. ¼ of section 14, but denied that there is or ever was a piece or parcel of land legally described and known as "relicted lot No. 21," and denied that plaintiff was the owner of the land included in said alleged or supposed relicted lot 21, and alleged that Lake Albert is a meandered body of water, abutting on plaintiff's said land lots, and that at the time of the commencement of this action there was situated in said lake, opposite the land of plaintiff, about 18 rods from the outer shore, an island, entirely surrounded by water, consisting of about 25 acres, the average altitude of which was about 20 feet above high-water mark, and which island never had been covered by the water of said lake. Defendants, by way of counterclaim, also alleged that they and their successors in interest had, for more than 20 years preceding the commencement of this action, been in the notorious, and exclusive adverse possession of the whole island, and as such adverse occupants were the owners of said island, and prayed judgment quieting and confirming title thereto in defendants. The allegations of defendants' counterclaim were denied by plaintiff. The court found that plaintiff was the owner of those portions of section 11 and 14, claimed by him, outside the meander line of said lake, but found that plaintiff had no title to any part of said lands embraced within what is designated as "relicted lot No. 21," and being within said meander line; that no legal survey was ever made of said alleged relicted lot No. 21, under the provisions of chapter 173, Laws of 1903, and that said island is not relicted land, subject to be surveyed under the provisions of said law. The court also found that, as against plaintiff, the defendants and their successors in interest for more than 20 years had been in open, notorious, and exclusive possession of the whole of said island, and, as against plaintiff, were the owners and entitled to possession thereof. Judgment was entered in accordance with said findings, and plaintiff appeals, alleging insufficiency of the evidence to sustain

the findings in relation to relicted lot 21, and also various other assignments of error.

It will be noted that the only controversy in this case is in relation to what is designated "Relicted Lot No. 21." The following plat shows approximately the location of plaintiff's lands bordering on said lake, and the alleged relicted lot No. 21, the boundaries of said lot 21 being shown by the dotted lines:

The approximate location of the island is also shown. It appears from the findings, and it was also shown by the evidence,

that Lake Albert is a natural, inland, meandered lake, with ir-
regular boundary, and with extreme length of about 5 miles,
and with extreme width of about 2½ miles; that the amount of
water in said lake is variable, depending upon climatic conditions;
that at times of high water said lake bed is covered by water
varying from one to ten feet deep; that at times of extreme and
extended drought the waters of said lake gradually recede from
the meander line and render portions of said lake bed fit for
the cultivation of crops; that except at rare periods of extended
drought the water in said lake bed is of a depth of from one to
ten feet; that at the time of the commencement of this action,
and for a long time prior thereto, there was an abundance of fish
in the water of said lake, and for many years the said lake has
been, and continues to be, generally resorted to by the public
for the purposes of boating, fishing, hunting, and trapping; that
at the time of the commencement of this action the said island
was entirely surrounded by water, approximately from one to
five feet deep; that at times of extreme low water there is no
water between the island and the meander line of plaintiff's said
lot, section 11; that at the time of the survey of said meander
line around said lake by the United States, no survey or note
was made of said island, and the same never has been noted,
meandered, or surveyed by the United States.

[1, 2] Under the particular circumstances disclosed as to the
character and conditions of Lake Albert, we are of the view that
no part of the said alleged lot 21 was ever in fact relicted land,
that legal reliction has never occurred, and that plaintiff never
has had any title to any part of said alleged relicted lot, within
the boundaries of the lake bed below the low-water mark, or any
interest in any part thereof, excepting only his purely riparian
right appurtenant to his meandered lots or parcels of land bor-
dering on the said lake. Reliction is land added to a tract front-
ing upon the waters of a lake, pond, or sream, by the permanent
uncovering of the land—the laying bare of the bottom by the
permanent retirement of the waters, never to return again. The
temporary subsidence of the waters occasioned by the seasons, or
by periods of drought, does not constitute reliction in the sense
of an addition to the contiguous land. Reliction is said to rest
in the law of nature, and is analogous to the right of the owner

of a tree to its fruit. Reliction is a *permanent* change that takes place by gradual and imperceptible degrees. Where water *periodically* rises over land and then recedes, there is no reliction. 7 Words and Phrases, 6063; 1 Ruling Case Law, 226, 240; 1 Weil on Water Rights, § 901; 40 Cyc. 637; 1 Farnham on Waters, p. 320; Sapp v. Frazier, 51 La. Ann. 1718, 26 South. 378, 72 Am. St. Rep. 493; Carr v. Moore, 119 Iowa, 152, 93 N. W. 52, 97 Am. St. Rep. 292. But, however, where the adjoining proprietor owns the title to the bed of the lake, it is immaterial when or how the shore is enlarged or the waters recede. Carr v. Moore, supra; Railroad Co. v. Butler, 159 U. S. 87, 15 Sup. Ct. 991, 40 L. Ed. 85; Gouverneur v. Ice Co., 134 N. Y. 355, 31 N. E. 865, 18 L. R. A. 695, 30 Am. St. Rep. 669. It therefore becomes necessary to determine whether or not the plaintiff, by virtue of the grant under which he claims, took title to the center of the lake in question, or whether only to the water's edge at low-water mark, and what are his rights to the shore between high and low water mark. The fact alone that the lake in question was meandered by the government survey does not directly control this matter as a meandered line is not considered a boundary line, but merely serves to define the sinuosities of the bank of the lake, and a means of ascertaining the amount of land in the fractional tract subject to sale, and which is to be paid for by the purchaser. St. Paul Ry. Co. v. Schurmeier, 7 Wall. 272, 19 L. Ed. 74, and note page 972. We are of the view that a determination of these questions must depend upon the character of the lake in question.

Section 192, Civil Code, provides:

"The ownership of land below ordinary high-water mark, and the land below the water of a navigable lake or stream, is regulated by the laws of the United States or by such laws of the state as the Legislature may enact. The state is the owner of all property lawfully appropriated or dedicated to its own use, and of all property of which there is no other owner."

Section 289, Civil Code, provides as follows:

"Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders upon a navigable lake or stream, takes to the edge of the lake or stream at law-water mark, and all navigable rivers shall

remain and be deemed public highways. In all cases where the opposite banks of · any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both."

It is evident that the framers of these sections of our statute law contemplated that there were "navigable lakes" within the boundaries of this state. What, then, is meant by a "navigable lake," within the meaning of these sections of our Code? It is said that formerly, under the English common law, the test as to whether waters were public or private was whether they were navigable or not, and the test of navigability was whether or not the tide ebbed and flowed. Therefore the common-law test of navigability, as indicated by ebb and flow of tide, has no application to our natural inland lakes, and we must look for some other statutory or common-law test to ascertain what constitutes a navigable lake. We should look where the circumstances and natural surroundings are similar to those of this state. We have no express statutory test as to what constitutes a navigable lake. The applying of the common-law tide test was for the ultimate purpose of determining whether waters were public or private. In this country many courts have held that whether or not certain waters are navigable depends on the natural availability of such waters for public purposes, taking into consideration the natural character and surroundings of such waters. Mr. Farnham, in his work on Waters and Water Rights, p. 265, says:

"When a lake is so small in size as to constitute merely a pond, and to be entirely upon the land of one individual, there is no reason for the public asserting any · right in it, and no question of public ownership is raised. Between this class of lakes or ponds and the Great Lakes there are a large number which are more or less useful to the public, but may not be sufficiently so to require the title to be retained by the public. There is a point in the diminishing size below which no one can doubt that the title should be in the individual. Conversely, there is a point above which every one will agree that no advantage can come from placing the title in the individual, while every advantage would result in retaining the title in the public."

It is said that the rule should be that if the lake is of suf-

ficient size to make private ownership to the center of the lake unreasonable when compared with the amount of the land owned by the shore proprietor, or if the fisheries of the lake are of such a character that they should be exercised in common by the public, then the waters of such lake should be deemed public or navigable waters. One of the leading cases upon this proposition is Lamprey v. State, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 St. Rep. 541, in which the Supreme Court of Minnesota, speaking through Mr. Justice Mitchell, said:

"What has been already said is sufficient for the purposes of the present case; but, to avoid misconception, it is proper to consider what is the definition or test of 'navigability,' as applied to our inland lakes. The division of waters into navigable and nonnavigable is but a way of dividing them into public or private waters—a classification which, in some form, every civilized nation has recognized; the line of division being largely determined by its conditions and habits. In early times, about the only use—except, perhaps, fishing—to which the people of England had occasion to put public water, and about the only use to which such waters were adapted, was navigation, and the only waters suited to that purpose were those in which the tide ebbed and flowed. Hence the common law very naturally divided waters into navigable and nonnavigable, and made the ebb and flow of the tide the test of navigability. In this country, while still retaining the common-law classification of navigable and nonnavigable, we have, in view of our changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, while still adhering to navigability as the criterion whether whaters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a channel for any useful commerce, including small streams, merely floatable for logs at certain season of the year. Most of the definitions of 'navigability' in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under prsent conditions, of society, bodies of

water are used for public uses other than mere commercial navi-. gation in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nomenclature is preferred. Certainly we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit. Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes. which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated. When the colony of Massachusetts, 250 years ago, reserved to public use her 'great ponds,' probably only fishing and fowling were in mind; but, as is said in one case, 'with the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, because capable of many others, which are within the design and intent of the original appropriation. The devotion to public use is sufficiently broad to include them all, as they arise.' West Roxbury v. Stoddard, 7 Allen, 158. If the term 'navigable' is not capable of a sufficiently extended meaning to preserve and protest the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters. But, however that may be, we are satisfied that, so long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule. When the waters of any one of them have so far receded or dried up as to be no longer capable of any beneficial use by the public, they are no longer public waters,

and their former beds, under the principles already announced, would become the private property of the riparian owners."

The Supreme Court of Iowa, in State v. Jones, 143 Iowa, 398, 122 N. W. 241, said:

"Recognizing the public utility of such waters for the purposes of fishing, boating, hunting, and the like, uplands have not been surveyed, platted, or sold by the government beyond the high-water mark. The waters and the soil beneath have been withheld from private appropriation by the government for the benefit of all the people; and since the earliest settlements the people have continued unmolested in the enjoyment of the benefaction. The policy of the state in stocking these small bodies of water with game fish, and their protection by law, has obtained for many years. These lakes afford means of recreation. They supply food of inestimable value. The conclusion is unavoidable that the government, in preserving the numerous small lakes of the state from sale, intended them for the public use. No attention has been bestowed thereon since by the government, and in all respects, save in the regulation of commerce, non-navigable lakes, like those which are navigable, have been treated as under the control and sovereignity of the state."

In Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286, 33 L. R. A. 146, 52 Am. St. Rep. 380, the Supreme Court of Illinois said:

"The policy of the state in recent years has been to stock its waters, both streams and lakes, with fish, as a means of giving cheap and valuable food to our citizens, and with this purpose regular appropriations and expenditures are made. If we depart from the reasonable rule we have established, the small unnavigable lakes would become the private waters of riparian owners, appurtenant to their lands, with exclusive rights thereon as to boating, fishing, and the like, from which the body of the people would be excluded—a principle inconsistent with and not suited to the condition of our people, nor called for as a rule of law. * * * * We are asked to overrule the latter case (Trustee v. Schroll, 120 Ill. 509, 12 N. E. 243, 60 Am. Rep. 575), and hold the grant to the riparian owner conveys the bed of a nonnavigable lake and makes its waters mere private waters. We decline to do so. By such holding, so long as such meandered lakes exist, over their waters, and bed when covered with water,

the state exercises control, and holds the same in trust for all the people, who alike have benefit thereof in fishing, boating, and the like. By the adoption of this principle, which applies alike to all meandered lakes, streams, and rivers, there is no conflict with that applying to the sea, and littoral proprietors and riparian owners alike have all the benefits and rights of such ownership and take accretions to their lands."

In Nee-pee-nauk Club v. Wilson, 96 Wis. 290, 71 N. W. 661, Mendota Club v. Anderson, 101 Wis. 479, 78 N. W. 185, Hammond v. Shephard, 186 Ill. 235, 57 N. E. 867, 78 Am. St. Rep. 274, and Schulte v. Warren, 218 Ill. 108, 75 N. E. 783, 13 L. R. A. (N. S.) 745, it is held that the shore owner on meandered inland lakes, whether navigable or nonnavigable, takes title only to the water's edge; the ownership of the bed of the lake being in the state in trust for the people, or the public, for the purpose of fishing, fowling, boating, and the like. In these jurisdictions, the question of whether certain waters were public or private, and whether the shore owner took title to the middle of the lake or water's edge, was made to depend upon whether or not such waters were more reasonably adopted to public than to private use, rather than to depend upon the common-law tests of navigability. In these jurisdictions last cited the courts kept in view the common-law distinctions as to navigable and nonnavigable waters, but, with the same result as in Minnesota, applied the rule of *navigable* waters to what in such jurisdictions are designated as "inland unnavigable lakes," on the ground that such lakes constituted *public* waters and were therefore within the reason of the common-law rule as to what constituted, in fact, *navigable* waters. In McMannus v. Carmichael, 3 Iowa, 1, the court held that the common-law test of navigability is not applicable to inland waters in this country; that the ebbing and flowing of the tides is not the only test of navigability; that the term "navigable" embraces within itself, not merely the idea that the waters could be navigated, but also the idea of publicity, so that saying that waters are public is equivalent, in a legal sense, to saying that they are navigable.

[3-6] We are therefore of the view that Lake Albert is a navigable lake within the meaning of sections 192 and 289 of our Civil Code, upon the ground that the waters of said lake are of

such a character and extent that they constitute public waters, and that the state is the owner of the bed of said lake. And when we say that the state is the owner of the bed of said lake we do not mean that the state is the proprietary owner in the sense that the state might sell or otherwise dispose of the same to private individuals for private ends, but that the state holds the title to such lake bed in trust for the benefit of the public. Lamprey v. State, supra; People v. Kirk, 162 Ill. 138, 45 N. E. 830, 53 Am. St. Rep. 277; I. C. Ry. Co. v. Chicago, 173 Ill. 471, 50 N. E. 1104, 53 L. R. A. 408; Commissioners v. Fahrney, 250 Ill. 256-266, 95 N. E. 194; Fuller v. Shedd, 161 Ill. 462, 44 N. E. 286, 33 L. R. A. 146, 52 Am. St. Rep. 380. Under this view of the case the plaintiff had title to the edge at low-water mark on said lake. Neither high nor low water mark means the highest or lowest point reached by the waters of a lake during periods of extreme and continued freshets, or periods of extreme and continued drought, but does mean the high and low points of variation of such waters under ordinary conditions, unaffected by either extreme. Farnham on Water Rights, p. 1461; Crapenter v. Board of Commissioners, 56 Minn. 513, 58 N. W. 295; Dow v. Electric Co., 69 N. H. 498, 45 Atl. 350, 76 Am. St. Rep. 189; Stover v. Jack, 60 Pa. 339, 100 Am. Dec. 566; McBurney v. Young, 67 Vt. 574, 32 Atl. 492, 29 L. R. A. 539. While the title of the riparian owner on navigable or public waters extends to ordinary low-water mark, still his title is not absolute, except to ordinary high-water mark, and as to the intervening shore space between high and low water mark the title of the riparian owner is qualified or limited by and subject to the rights of the public. Sections 192 and 289, Civil Code; Carpenter v. Board of Commissioners, supra; Stover v. Jack, supra. See note to Arnold v. Mundy, 10 Am. Dec. 388.

What, then, are the respective rights of plaintiff and the state as to the shore intervening between high and low water mark? The plaintiff has the right of access to and use of such waters; he has the right to accretions and relictions which may attach to such shore; he has the right to use such shore in all ways that he may desire, so long as and with the exception that he does not interfere with or prevent the public from also using or having access to the same for the purpose for which the pub-

lic has a right to use it, viz., navigating, boating, fishing, fowling, and like public uses. And the state has no right to control or interfere with plaintiff's said use so long as plaintiff does not interfere with said public use. Farnham on Water Rights, p. 333. What we have just said in relation to public or navigable lakes has no application to ponds or nonnavigable lakes, whether meandered or not, which could not reasonably be the subject of such public use, or to lakes, which at some former time might have been public or navigable, but which have been by some natural cause permanently and forever changed in character, so that the public could no longer reasonably claim to use the same for such public purpose. The riparian shore owners of such nonnavigable or nonpublic ponds and lakes have absolute ownership of the entire bed and shore of such lakes and ponds. Olson v. Huntamer, 6 S. D. 364, 61 N. W. 479; Shell v. Matteson, 81 Minn. 38, 83 N. W. 491; Carr v. Moore, 119 Iowa, 152, 93 N. W. 52, 97 Am. St. Rep. 292.

[7, 8] It is contended by appellant that the finding of the court that defendants and their successors in interest had acquired title to the island, as against plaintiff, by prescriptive right based upon more than 20 years' adverse possession and user, is not sustained by the evidence; but we are of the opinion, in view of the fact that there is no evidence showing that plaintiff has acquired any right thereto by reliction—no reliction having taken place—that it is immaterial to plaintiff whether defendant has so acquired such title or not. We are of the view that this island in question, not having been meandered and no note thereof having been made in the government survey, and by having treated said island as a part of the lake bed, the United States thereby abandoned its right thereto, and that title, by force of such circumstances, became vested in the state along with the rest of the lake bed. Under these circumstances, the island became real property, without an owner other than the state. Section 192, Civil Code; Webber v. Axtell, 94 Minn. 375, 102 N. W. 915, 6 L. R. A. (N. S.) 194. That case involved title to an island attached to the riparian owner's land by accretion—the permanent formation of a bar connecting the island to the main land. The state not being a party to this action, we express no

opinion as to the rights of defendants, as against the state, to the island.

The judgment and order appealed from are affirmed.

WHITING, J., took no part in this decision.